**FEDERAL INSURANCE COMPANY, Plaintiff,**

v.

**THOMAS W. PERRY, INC., Defendant.**

**Civ. A. No. 85–0991.**

United States District Court, District of Columbia.

May 7, 1986.

William F. Causey, Donahue, Ehrmantraut & Montedonico, Chartered, Washington, D.C., for plaintiff.

Dana L. Scott, Jr., Fairfax, Va., for defendant.

## DECISION AND ORDER

JACKSON, District Judge.

Plaintiff Federal Insurance Company ("Federal"), a New Jersey property and casualty insurer, brings this action, sounding in both contract and tort, as subrogee of an insured homeowner to whom it paid in excess of $100,000 for water damage done to his Washington, D.C., dwelling and

its contents. Defendant Thomas W. Perry, Inc. ("Perry"), a Delaware heating oil retailer based in Washington's Maryland suburbs, allegedly failed in a duty to restart the insured's oil-fired hot water furnace in sub-freezing weather in January of 1984, in consequence of which his plumbing burst.[1] Upon the following facts, as found by the Court in accordance with Fed.R.Civ.P. 52(a) upon trial without a jury, the Court concludes, for the reasons hereinafter set forth, that judgment must be given for plaintiff.

## I.

In and prior to January, 1984, plaintiff's insured, Joseph Smith, Jr. ("Smith"), a self-employed builder, occupied a single-family residence at 3109 Garfield Street, N.W., in the District of Columbia. He also owned a vacation home in Bethany Beach, Delaware, a resort on the Atlantic coast some 150 miles distant from Washington. Smith had for years been a home heating oil customer of Perry's for his Washington, D.C., residence, establishing over time, however, an indifferent credit history with the firm which, in August, 1983, resulted in his being taken off Perry's "automatic delivery" schedule and placed on a "C.O.D." payment basis.[2]

On December 14, 1983, Smith ordered, received, and paid for a delivery of 200 gallons of heating oil from Perry. On December 22nd he went to his beach house for an extended stay, leaving the Garfield Street house unoccupied, but under inter-mittent observation by a neighbor, Barbara Meyer, who lived three doors away and would visit it while walking her dog twice a day, and an employee, Jay Hirsch, who came by from his Alexandria, Va., home every other day to check the house, the mail, and the telephone answering machine. Meyer and Hirsch gained entrance to the house by using a door key hidden on the premises.

On Wednesday, January 11, 1984, both Meyer and Hirsch telephoned Smith at the beach to report to him that the interior of his house was cold and apparently without heat from the furnace. Smith asked Hirsch to check to see if fuel remained in the tank; Hirsch did so, found the tank empty, and reported it to Smith. About 7:00 that evening, therefore, Smith called Perry and requested a delivery of oil and a "restart" of the furnace. Perry apparently agreed to do both, although what precisely it was to do about starting the furnace was unspecified. The following morning, when Meyer reported to Smith that the house remained cold, Smith once again called Perry and was assured that service was "on its way."[3] (Hirsch had earlier been instructed to leave the house unlocked to enable Perry's service personnel to enter to restart the furnace).

Perry's dispatcher directed the regular driver on the route serving Smith to deliver the oil and to "try to start the furnace." The driver delivered approximately 150 gallons of oil through an exterior fillpipe, but was unable, upon entering the house, to

---

1. Jurisdiction is predicated upon 28 U.S.C. § 1332.

2. On "automatic delivery" Perry would make regular deliveries on its initiative at calculated intervals and bill the customer. "C.O.D." customers were required to place their own orders for oil and pay for it on arrival.

   Smith contends he had never formally been removed from the "automatic delivery" schedule or had been restored to it. The Court finds otherwise. Smith admits (as his phone records show) that he called Perry on January 6th to "order oil," which would have been unnecessary had he been on "automatic delivery." The evidence does not disclose the results of the January 6th call.

3. Smith says he also called Perry's credit department on January 12th to get approval for a C.O.D. delivery without his being present to pay for it, and his phone records reflect that the call was made. Perry's credit manager remembers getting authority to approve a delivery for Smith on one occasion without immediate payment, but she believes it to have occurred in December. The truck driver who made the December delivery, however, remembers getting a check in payment at the time.

   Perry does not dispute that it agreed to make an oil delivery and "courtesy restart" for Smith on January 12th, notwithstanding it would not be paid immediately.

get the furnace started.[4] He called the dispatcher from his truck to ask that a serviceman be sent out. The dispatcher either made out a service ticket or reported the problem to the service manager orally, imparting as well the information that Smith was out-of-town. The service manager, however, purposely ignored it, for several specific reasons: the company, he thought, had no "authorization" to go back into Smith's house; he didn't know if the door would still be unlocked; he didn't know how to get in touch with Smith to get authorization or access; and, "I wanted to know who was going to pay me." (Tr. 175–76).

On Friday and Saturday, January 13–14, both Meyer and Hirsch visited the house, found it still cold, and reported the fact to Smith who replied that he had been assured by Perry that it would be taken care of[5]. He took no further action until informed by his daughter on Sunday, January 15th, that she had gone to the house and found the plumbing ruptured and the interior in shambles caused by escaping water.

Federal retained an experienced insurance adjuster to settle Smith's claim under his homeowner's policy. Ultimately Smith and the adjuster agreed on a repair cost figure for the premises, (including temporary protection, demolition and debris removal) of $65,073.68. Contents damage was negotiated to $25,039.48, and the adjuster allowed Smith approximately $11,000 in additional living expenses until the house was once more habitable in July, 1984. It is the sum of those amounts paid to Smith under the several coverages afforded by its homeowner's policy that Federal seeks to recover from Perry here, upon several theories of contract and tort. Perry denies

any contractual duty to Smith, asserts that it was duly careful in doing what it did to restore heat to the house; submits that there is a failure of proof as to the proximate cause of the damage; and contends that Smith himself was negligent or assumed the risk of frozen water pipes when he left his home untended in mid-winter with the plumbing system undrained. Perry also questions the reasonableness of the repair costs and Smith's additional living expenses while awaiting the rehabilitation of his residence.[6]

## II.

■ The evidence supports the conclusion that Smith and Perry formed a contract, but the terms of that contract, whether characterized as express or implied, do not support the claim for damages for its breach that Federal makes here. At best, Perry contracted to deliver oil, at its current market price, and to have its driver attempt to restart Smith's furnace at no additional charge, in consideration of Smith's express or implied promise to pay for the commodity when billed for it. Nothing in the course of communications between Smith and Perry supplies a basis upon which to conclude that Perry had promised to do whatever might have been necessary to assure that Smith's house was adequately heated, or even that the furnace would be restarted irrespective of difficulties encountered.

■ Nor does the doctrine of promissory estoppel provide a contractual ground upon which plaintiff would be entitled to recover the amount paid to Smith under his policy. Promissory estoppel is recognized in the law of the District of Columbia as a theory allowing recovery in contract when

4. The driver found the reset button dismounted from the front of the furnace and dangling from the wires. The evidence provides no explanation.

5. Smith asserts that, notwithstanding the assurance, he nevertheless called Perry several times those two days, from some other phone in Bethany Beach for which he has no records, to inquire why the house remained cold. Perry has no knowledge of such calls, and Smith has

no other evidence of them. The Court finds that plaintiff has failed to prove that they were made.

6. The parties agree that Federal, as subrogee, is subject to defenses which would be availing as to Smith, *see London Guarantee & Accident Co., Ltd. v. Enterprising Services, Inc.*, 192 A.2d 292, 293 (D.C.1963), and that District of Columbia law governs all aspects of this case.

there may have been a failure of proof of certain elements necessary to the formation of an express contract (usually those of manifested mutual assent or consideration) if a refusal to enforce a promise admittedly made would in the circumstances (usually reliance) result in injustice. *See Bender v. The Design Store*, 404 A.2d 194, 195–96 (D.C.1979); *see also* Restatement (Second) of Contracts, § 90 (1981); Williston, Contracts, § 140 (3rd ed. 1957). But once again Federal's argument stumbles on what the evidence actually *does* prove here, namely, that Perry's only promise (which was both assented to and supported by a promise to pay) was fully performed: the oil was delivered, and Perry's driver did attempt to start the furnace.

Plaintiff also advances, however, a theory supporting a recovery in tort which, the Court concludes, compels the award of the damages sought. The theory has been variously termed (e.g., the "doctrine of negligent rescue" or the "good Samaritan rule"), but is presently expressed, in the words of the Restatement (Second) of Torts, § 323 (1965), as a rule imposing liability for the "negligent performance of [an] undertaking to render services," and is stated as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

And the basic principle of Restatement, § 323, has, it appears, likewise been adopted as the law of the District of Columbia. *See Remeikis v. Boss & Phelps, Inc.*, 419 A.2d 986, 991 (D.C.1980); *Arnold's Hofbrau, Inc. v. George Hyman Construction Co., Inc.*, 480 F.2d 1145, 1148 (D.C.Cir.1973).

Until January 12th Perry owed no duty whatsoever to Smith. It had no express service contract for his furnace.[7] It had removed him from its schedule of approved credit customers for whom it undertook to monitor heating fuel consumption and keep them supplied without initiative on their part. When Smith called on January 12th Perry could have refused his business altogether, or offered to extend him such service, and on any terms, as it explicitly chose to dictate. Instead it did neither. It agreed to provide him what he asked for, but in circumstances in which it knew, or should have known, that he was relying upon it to restore heat to a vacant house, now cold, in inimical weather conditions, and that its failure to act with reasonable care to accomplish what he wanted in time, or its abandonment of the task without similarly timely notice, would increase the risk of the very harm he sought to avert.

The prevailing climatological situation was apparent to, and in the contemplation of, both Smith and Perry; Perry knew Smith needed an operative furnace, not for comfort but to prevent, if possible, the catastrophe which would ensue if the plumbing froze and ruptured. Concommitant with its undertaking to deliver fuel and attempt to restart the furnace, therefore, Perry assumed, at the least, a duty to take reasonable steps to notify Smith promptly when it was unable to provide the necessary heat. At some point, of course, it should have become apparent to Smith that Perry had abandoned him, but the Court cannot conclude as a matter of fact or law, that that point had been reached, in sufficient time for him to have sought aid elsewhere, during the two days between his call of January 12th and the disaster which had befallen by the 15th.

---

7. Perry offers its customers a one-year oil burner maintenance agreement under which it undertakes to perform certain services for an annual fee. (Defendant's Exhibit 16). The contract, however, contains substantial disclaimers of liability which, ironically, might have relieved Perry of liability here had one been in effect with Smith and the services rendered pursuant to it.

Smith insists someone at Perry had been told where he was, and that Perry had been given the names of Meyer and Hirsch to contact if it needed to get in touch with him or access to his house. While not expressly denying that it had been so informed, Perry asserts that the people in its organization who would have been able to make use of the knowledge did *not* know where Smith was or how to reach him. But there is uncontradicted evidence that Perry's top management had known Smith socially for years, and knew a good deal about him generally, and certainly had enough information to make at least some effort to let him know that the process of restoring heat to his home had been initially unsuccessful, was more complicated than originally assumed, and required his own immediate attention.[8]

■ Perry also contends that plaintiff has failed to prove that its inability to restart the furnace was the proximate cause of the burst plumbing; the sub-freezing weather had persisted for some time, it argues, and the pipes might well have frozen before its aborted attempt to ignite the furnace, the appearance of any damage, of course, having been delayed until a rise in ambient temperature caused standing ice to revert to liquid form. Again, however, there is uncontradicted evidence that Hirsch had used a bathroom in the house on Saturday, January 14th, and found the plumbing working, the unrebutted inference to be drawn from the fact being that the systemic water was still in a liquid state at the time.

■ Finally, Perry contends that Smith was contributorily negligent or assumed the risk in leaving his house in mid-winter for a protracted period without closing the intake valve and draining the internal plumbing, particularly without first making certain that the fuel supply on hand at his departure would be sufficient to last out his absence. But a finding of

antecedent fault on the part of a plaintiff is inconsistent with, and therefore irrelevant to the application of, the principle of Restatement, § 323, which presupposes a plaintiff already in difficulty, for whatever reason, before any duty has arisen on the part of the one who undertakes to render assistance. *Berg v. Chevron U.S.A., Inc.*, 759 F.2d 1425, 1431 (9th Cir.1985). It is incumbent on the part of such a plaintiff to act with due care not to make his predicament worse once succor is on the way, but the volunteer who defaults in his duty once assumed to assist with due care cannot evade liability by pointing to the fact that the plaintiff in peril brought his troubles on himself to begin with.

■ Perry also complains that the amounts Federal paid to Smith pursuant to the policy were excessive. Smith's own construction company did the repair work, and Smith's living expenses for the period his Garfield Street house was uninhabitable suggest that he did not endure his exile in privation. Once again, however, Perry is confronted with uncontradicted testimony, namely, that of the independent claims adjuster (whose interests were adverse to Smith's while negotiating Federal's payments to him), to the effect that Smith's construction company made the repairs at cost, and, given the obligation of the policy to enable the insured to live in comparable circumstances while his home was being repaired, Smith's hotel and meal bills were not unreasonable.

For the foregoing reasons, therefore, it is, this 7th day of May, 1986,

ORDERED, that judgment be entered for plaintiff Federal Insurance Company against defendant Thomas W. Perry, Inc., for $101,016.66, with interest from the date hereof in accordance with 28 U.S.C. § 1961.

---

8. In addition to mechanical problems presented by the partially dismantled reset button, Perry's service manager correctly observed that it would have been folly to reheat an already-frozen water system without the presence of a plumber to deal with the situation as leaks began to appear.