934 F.2d 1267

**Doris ANDREWS and Otis
Andrews, Appellants,**

v.

**Thomas H. WILKINS, Individually and
in his Official Capacity, et al.**

No. 90–5225.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 25, 1991.

Decided May 31, 1991.

James E. McCollum, Jr., with whom Tilman L. Gerald was on the brief, for appellants.

John C. Cleary, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., were on the brief, for appellees.

Before MIKVA, Chief Judge, and D.H. GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Chief Judge MIKVA.

SENTELLE, Circuit Judge:

Appellants Doris and Otis Andrews brought this action against officials and representatives of the United States Park Police, United States Department of the Interior, and the United States, for the wrongful death of the Andrewses' son, Gino Andrews ("Andrews"). The district court granted summary judgment against appellants on their claims of both constitutional and common law torts against appellees. After reviewing appellants' allegations of error, we affirm the decision of the district court.

## I. FACTUAL BACKGROUND

This case arises from a bizarre series of events that began when Andrews urinated against the exterior wall of a public restroom facility at Hains Point in East Potomac Park. United States Park Police Officer Thomas Wilkins approached Andrews and advised him that he was being charged with urinating in public, and that Andrews would have to accompany Wilkins to the Park Police station to post collateral. When Wilkins moved toward Andrews with handcuffs, Andrews fled, running around

the restrooms, across the East Potomac Golf Course, and finally reaching the Washington Channel. With Wilkins in pursuit, Andrews climbed down into the Channel and began swimming toward Fort McNair on the opposite bank.

Wilkins pursued Andrews, first on foot, and then on his police scooter. Wilkins continuously notified the Park Police dispatcher of Andrews's actions and, when Andrews entered the Channel, directed the dispatcher to contact the Metropolitan Police Department Harbor Patrol. The dispatcher also sent additional Park Police patrol vehicles and a Park Police helicopter to the scene of Andrews's entry into the Channel.

Andrews swam approximately thirty to forty feet across the Channel, then turned back toward the Hains Point shore. At this point, it appeared that he began to tire and was in danger of drowning. After some hesitation and at the urging of a bystander, Wilkins went to one of the patrol cars, removed a life ring attached to fifty feet of rope, and threw it toward Andrews. The ring did not reach Andrews, and the rope tangled. One of Wilkins's fellow officers radioed the dispatcher to send another patrol car with a life ring, while Wilkins, without apparent urgency, retrieved the life ring, untangled the rope, walked closer to the Channel's edge, and threw the ring within approximately two feet of Andrews. Andrews was by this time apparently unconscious and unable to reach for the life ring.

Wilkins then removed his gun belt in preparation for a swimming rescue, but was dissuaded by fellow officers, who pointed out a District of Columbia Fire Boat and a private motor boat approaching Andrews. The officers hailed the private boat, piloted by George and Jennifer Sozio, who guided it alongside Andrews. Ms. Sozio extended her leg into the water for Andrews to grab onto, then, seeing that Andrews was unconscious and face-down in the water, reached toward Andrews with her arm. At the direction of the police, she also threw a life jacket toward Andrews. Ms. Sozio yelled to the police that Andrews

had gone underwater, stating, "I need to go in, I've been trained." They directed her not to go in the water, stating that "[h]e's an escaped prisoner, and could be dangerous."

Instead, the police signalled the Sozios to bring their boat to the Channel's edge, where a police officer boarded and directed them to return to Andrews. Although the Sozios returned their boat to where the life jacket was floating, Andrews's body had dropped out of sight. The officer told Ms. Sozio that Andrews "was an escape [sic] prisoner and was running from us. He jumped into the water himself, and I was afraid he was dangerous and would commandeer the boat, and force you to take him some where [sic], or take you as a hostage."

Approximately one-half hour later, the Harbor Patrol recovered Andrews's body from the Washington Channel. The Police immediately transported Andrews to the George Washington Hospital Emergency Room, where he was pronounced dead. The autopsy revealed the presence of PCP, marijuana residues, and alcohol in Andrews's bloodstream at the time of his death.

## II. DISCUSSION

### A. *Appellants' Constitutional Tort Claims*

Appellants claim that police actions toward Andrews—failing to rescue him and interfering with the Sozios' private efforts to rescue him—deprived Andrews of his Fifth Amendment right to life, liberty, and property without due process of law, thereby making out a constitutional tort if the police were acting under federal law, or a violation of 42 U.S.C. § 1983 if the police were acting under District of Columbia law. As the district court properly noted below, a constitutional tort claim against the government is subject to a heightened pleading standard. *Smith v. Nixon*, 807 F.2d 197, 200 (D.C.Cir.1986). To meet this standard, a claimant must make "nonconclusory allegations" that are "sufficiently precise to put defendants on notice of the nature of the claim and enable them to

prepare a response and, where appropriate, a summary judgment motion on qualified immunity grounds." *Hobson v. Wilson*, 737 F.2d 1, 29 (D.C.Cir.1984).

■ Qualified immunity is available to federal and state officials charged with constitutional torts so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations and footnote omitted). *See also Harris v. District of Columbia*, 932 F.2d 10, 13 (D.C.Cir.1991) ("Officials are liable for committing constitutional torts, ... only if they knew, or were unreasonable in not knowing, that the behavior violated the Constitution."). Applying this standard, we must agree with the district court that appellants "have failed to show that defendants violated a 'clearly established' right, such that a reasonable officer could or should have known that he was violating the Constitution." Memorandum Opinion, No. 88–1326, slip op. at 9, 1990 WL 102777 (D.D.C. July 11, 1990).

■ First, the police, as state officers, had no constitutional duty to rescue Andrews. *See Bradberry v. Pinellas County*, 789 F.2d 1513 (11th Cir.1986) (county had no constitutional duty to provide protective services to its citizens, and thus was not liable when its lifeguards failed to save decedent); *cf. also DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 197, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989) ("a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause"); *Archie v. City of Racine*, 826 F.2d 480 (7th Cir.1987) (emergency dispatcher's negligent failure to send an ambulance did not unconstitutionally deprive decedent of life without due process); *accord, Jackson v. Byrne*, 738 F.2d 1443 (7th Cir.1984). Thus, the police officers' failure to rescue Andrews is not a constitutional tort.

■ Nor is it a constitutional violation for a state officer to attempt an ineffectual rescue. *See Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir.1983) (police action directing traffic away from accident scene, thus barring potential private rescue attempts, does not constitute deprivation of life without due process). Indeed, since "the federal Constitution does not require states to expend their resources to guard against such accidents, ... it would be anomalous to hold them liable when they attempt to do so and fail in their effort." *Bradberry*, 789 F.2d at 1517 (citation omitted). Thus, appellants' allegations that the police were negligent in their rescue attempts is not a constitutional tort.

On the other hand, at least one circuit has held that police action deliberately or recklessly interfering with ongoing private rescue efforts may establish a constitutional tort. In *Ross v. United States*, 910 F.2d 1422 (7th Cir.1990), the Seventh Circuit held that an Assistant Deputy Sheriff committed a constitutional tort by interfering with private rescue efforts to save a twelve-year old child who drowned in Lake Michigan. Although two lifeguards, two fire fighters, one police officer, and two civilian scuba-divers arrived at the scene almost immediately, the local Deputy Sheriff barred all rescue attempts, asserting that it was county policy to allow only "authorized" fire department divers to engage in rescues. Potential rescuers were thus forced to stand idle until the "authorized" fire department divers arrived at the scene thirty minutes after the child had entered the water.

The Seventh Circuit found that the Deputy was aware of "a known and significant risk of death," but "consciously chose a course of action that ignored the risk." *Ross*, 910 F.2d at 1433 (citation omitted). The court therefore concluded that "a reasonable police officer in Deputy Johnson's position should have known that he could not use [his] authority to prevent private rescue efforts." *Id.* Accordingly, the claimants made out a valid claim for a constitutional tort, against which the Deputy lacked qualified immunity.

■ Here, appellants claim that the police interfered with the Sozios' private res-

cue efforts, thus making out a constitutional tort against Andrews. However, several factors distinguish *Ross* from the case at hand. First, in *Ross*, well-equipped, would-be rescuers had already arrived at the scene and were preparing to begin rescue efforts when the Deputy Sheriff arrived and ordered them to desist. The Deputy Sheriff in *Ross* directly and physically prevented these rescue efforts, ordering all persons on the scene to cease such efforts, threatening to arrest scuba divers who said they would attempt the rescue at their own risk, and positioning his boat so that scuba divers were unable to enter the water. *Ross*, 910 F.2d at 1424. Thus, the Deputy used his authority as a state actor to intrude into a purely private rescue effort.

In the present case, the police enlisted the Sozios' assistance, waving them to the site and requesting that they throw a life jacket to Andrews. Thus, rather than using their authority to interfere in a private rescue, the police officers used their authority to involve the Sozios in the police rescue efforts. Given that they were responsible for Ms. Sozio's involvement, the police were entitled, if not obliged, to prevent Ms. Sozio from endangering her life in the course of a police rescue effort. Based on the decedent's drastic behavior in the face of a misdemeanor charge, the police could and did conjecture that Andrews was wanted for other charges—perhaps involving a violent crime—or that he was acting under the influence of drugs. (Andrews was in fact also subject to warrant for his arrest at the time on felony charges of possession of cocaine with intent to distribute.) Thus, the facts of this case are much less troubling than those in *Ross*, given the fact that the police solicited Ms. Sozio's aid as part of an ongoing police rescue effort, that the police could not have known Ms. Sozio's level of safety training or skills, and that they were concerned with Andrews's bizarre behavior.

█ Even if such action could be construed by this Court as recklessly interfering with a private rescue effort, such a conclusion could not have been clear to the police at the time of the rescue. A federal or state officer is protected by qualified immunity unless the officer reasonably could have known that his or her action would violate an individual's constitutional rights. This judgment turns on "the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted). As this Court has emphasized, " 'the right the official is alleged to have violated must have been "clearly established" in a ... particularized ... sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what [that official] is doing violates that right.' " *Brogsdale v. Barry*, 926 F.2d 1184, 1191 (D.C.Cir.1991) (quoting *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3039). While it should have been clear to the police that they could not "arbitrarily assert [their] power so as to cut short a person's life," *Ross*, 910 F.2d at 1433, it certainly could not have been clear to them that they were required to refrain from taking any action when a private citizen, drawn into a police rescue operation, was about to expose herself to substantial danger, of which she was not completely aware. Whatever constitutional right to unhindered private rescue efforts Andrews may have had, it was by no means clearly established that such a right precluded police efforts directed at the safety of the potential private rescuer. Thus, appellants do not state a cognizable constitutional tort claim in this case.

Therefore, neither a *Bivens* theory constitutional tort claim nor a section 1983 claim will lie, so we need not determine whether the police were acting under federal or District of Columbia authority in order to determine which action would be appropriate. Rather, we need only affirm the district court's decision granting summary judgment for appellees, as appellants' failure to make out a claim for a constitutional tort vitiates both causes of action.

B. *Appellants' Common Law Tort Claims*

The district court also granted summary judgment against appellants for their com-

mon law claims against the United States, including 1) negligence, in the form of the police officers' individual negligence during rescue efforts, and the United States' negligence in ineffectively supervising and training its police officers; 2) liability under the "last clear chance" doctrine; and 3) willful and wanton negligence. As a matter of law, the district court found that appellants' claims under negligence were barred by the decedent's contributory negligence, and that no evidence supported a cause of action for "last clear chance" or willful and wanton negligence.

In the District of Columbia, contributory negligence is a complete bar to recovery. *Wingfield v. Peoples Drug Store*, 379 A.2d 685, 687 (D.C.1977). It is true that contributory negligence is virtually always a question of fact for the jury. *Jeffries v. Potomac Dev. Corp.*, 822 F.2d 87, 91 (D.C.Cir.1987). However, this case presents just such an "unusual" and "extraordinary" case as to justify the district court in removing the question of contributory negligence from the jury. *See id.* As the district court found, three uncontroverted facts make out a clear case for contributory negligence: Andrews was fleeing law enforcement officers in an effort to evade arrest; Andrews swam in a Channel in violation of federal regulations, 36 C.F.R. § 7.96(e); and Andrews was under the influence of PCP, marijuana, and alcohol. Given these uncontroverted facts, we find no error in the district court's conclusion that no reasonable jury could find an absence of contributory negligence. Andrews's contributory negligence thus bars appellants' negligence claims against the United States.

So, too, fails appellants' claim that the United States could have avoided Andrews's death under the "last clear chance" doctrine. Under District of Columbia law, a plaintiff may make out a claim for negligence under the "last clear chance" doctrine by alleging

(1) that plaintiff was in a position of danger caused by negligence of both plaintiff and defendant; (2) that the plaintiff was oblivious of the danger or unable to extricate himself from the position of danger; (3) that defendant was aware, or by the exercise of reasonable care should have been aware of the plaintiff's danger and obliviousness or inability to extricate himself from the danger; and (4) the defendant with means available to him was by the exercise of reasonable care able to avoid [harming] plaintiff after he became aware of the latter's danger and inability to extricate himself from danger, and failed to do so.

*Queen v. Washington Metropolitan Area Transit Authority*, 842 F.2d 476, 481 (D.C. Cir.1988), quoting *Washington Metro. Area Transit Auth. v. Jones*, 443 A.2d 45, 51 (D.C.1982). Here, appellants' claim fails on the first prong of the test, as decedent was in a position of danger by virtue only of his own actions. *Cf., e.g., Cameron v. City of Pontiac*, 813 F.2d 782 (6th Cir.1987) (police action not proximate cause of death where decedent ran onto highway and was killed while fleeing arrest).

Finally, we find no error in the judge's conclusion that there was no willful or wanton negligence on the part of the police. To constitute willful or wanton negligence, the police actions must involve "such reckless disregard of security and right as to imply bad faith." 3 S. SPEISER, C. KRAUSE, A. GANS, THE AMERICAN LAW OF TORTS § 10.1, at 354 (1986) (footnote omitted). Here, even in the worst possible light, the evidence shows only that the police were less than enthusiastic in the performance of their jobs and placed a higher value on the safety of Ms. Sozio than they did upon the possibility that she could save Andrews. This is insufficient to establish bad faith. Instead, the uncontroverted facts indicate that the police provided basic rescue services: throwing a life ring to Andrews, contacting the police helicopter and Harbor Patrol, and utilizing the assistance of the Sozios' private boat–actions that are hardly unresponsive to Andrews's danger. Accordingly, the district court did not err in granting summary judgment on appellant's claims that the police engaged in willful and wanton negligence.

We find our colleague's dissent on this point mystifying. The dissent admits that "the Park Police ... owed the Sozios a countervailing duty not to endanger their lives as a part of the rescue operation" (dissent at 3), but then asserts that carrying out that duty should subject them to liability. Justifying this conclusion, our colleague asserts that "the stated reason given by the Park Police as to why Ms. Sozio should not proceed further was not true...." *Id.* Though our colleague promises to discuss that point more fully below, the further discussion is not enlightening. As the entire dissent hinges upon this supposed untruth, it would seem incumbent upon our colleague to move beyond the simple assertion that the statement by the police was "false" and "patently untrue." Dissent at 102 and 104.

In introducing his accusation of untruth, our colleague asserts that the Park Police warning to Ms. Sozio not to get in the water with Andrews "because Andrews was an escaped prisoner and could be dangerous ... was false: Andrews was not an escaped prisoner...." Dissent at 102. Our colleague does admit that "one could call him a fleeing misdemeanant," *id.*, but he never explains why a misdemeanant does not become an escaped prisoner when he is arrested and then flees.[1] If there is a distinction, our colleague explains neither its origin nor its significance. He certainly never explains why officers in the course of emergency duty should be held accountable for whatever technical difference in terminology there might be when shouting a warning to citizens whom he concedes they have a duty to protect.

Our colleague also takes exception to the police assertion to the Sozios that Andrews "could be dangerous." From the point of view of the police officers not blessed with our hind-sight vantage, this statement was entirely accurate. Our colleague writes that Andrews "was already unconscious at the time Ms. Sozio attempted her rescue, and therefore posed no conceivable threat to her or anyone else." Dissent at 102.

What he neglects to mention is that the Park Police had no way of knowing this at the time, and we know this only as a result of Ms. Sozio's subsequent witness statement. In fact, Ms. Sozio also recounts that "someone in the policeman's direction yell[ed] 'throw the life preserver,'" which would seem to confirm that those on shore were not aware that Andrews was unconscious.

While we take no delight in writing ill of the dead, the evidence is uncontested that Gino Andrews, at the time of death, had a blood ethanol level of .03 percent, a blood phencyclidine level of 0.012 mg percent and a lung phencyclidine level of 0.029 mg percent, as well as a positive response for blood cannabinoids. The record further discloses that a phencyclidine "user readily loses his orientation while swimming or immersed and frequently drowns, sometimes in very small amounts of water." Nothing in this evidence is inconsistent with the apparent proposition that these officers had no reason to believe that the appellant would become unconscious or drown faster than anyone else, except the same evidence that they had that he was dangerous; that is, that he acted in a dangerous and bizarre fashion. To assert that "the warnings to Ms. Sozio that Gino Andrews was an 'escaped prisoner [who] could be dangerous' were patently untrue," is simply subjecting the officers' conduct to our hind-sight. *See* dissent at 104. So, too, is our colleague's assertion that "what is truly bizarre is the behavior of the United States Park Police." Dissent at 102. Granted, his statement that "urinating in public ... and fleeing arrest do not transform a 21 year old into a hardened criminal who poses a threat to private rescuers," is literally a true one. *See* dissent at 102. It is, however, also true that fleeing from police and leaping into the Washington Channel after a misdemeanor arrest is not the act of an ordinary misdemeanant, but rather the behavior of a desperate fugitive or one on drugs. That the record discloses

---

1. Though the dissent questions the word "arrested," we accept as true the allegations of the complaint not contested by pleading or affida-

vit. "This is an action arising from the *arrest* and drowning of Gino Marquette Andrews." Complaint at ¶ 1 (emphasis supplied).

Andrews to be at least somewhat deserving of both these labels should come as no surprise.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

MIKVA, Chief Judge, dissenting in part:

Gino Andrews was arrested for urinating behind a locked comfort station at Hains Point. When the police officer produced handcuffs and told Andrews that he would have to come to the station, Andrews fled. The policeman chased on foot and motor scooter until Andrews dove into the Washington Channel of the Potomac River and started swimming toward Fort McNair. While there is some dispute about how strenuous the Park Police on the scene were in their rescue efforts, there is no dispute that, shortly before Andrews drowned, a private boat operated by George and Jennifer Sozio got close to him. Ms. Sozio prepared to dive into the water, stating that she was trained in life-saving and could save Andrews. But a police officer on shore directed her not to attempt the rescue because Andrews was an escaped prisoner and could be dangerous. The statement was false: Andrews was not an escaped prisoner (at most one could call him a fleeing misdemeanant), his outstanding bench warrant only came to light *after* the incident, and no one had seen any weapon (nor was one recovered afterward). Indeed, if the majority is correct in their rendition of the facts, Gino Andrews was already unconscious at the time Ms. Sozio attempted her rescue, and therefore posed no conceivable threat to her or anyone else.

Gino Andrews' parents filed suit against various defendants, including the Park Police and the United States, asserting constitutional, statutory and common law tort claims. The Andrews alleged that their son was chased into the Channel and that the Park Police officers at the scene refused to rescue him, prevented two persons on shore from attempting a rescue, and

interfered with Ms. Sozio's rescue attempt. Generally, I concur in the court's disposition of the constitutional and statutory claims, as well as most of the common law claims against the individuals and the United States. I am dismayed, however, by the dismissal of appellants' claim that the Park Police were negligent in their rescue efforts when they prevented Ms. Sozio's rescue attempt. The majority calls this case "bizarre," but what is truly bizarre is the behavior of the United States Park Police. Urinating in public (behind a locked comfort station) and fleeing arrest do not transform a 21 year old into a hardened criminal who poses a threat to private rescuers. The facts alleged by appellants, many of which were undisputed, warranted a trial on the common law tort claims which alleged that the Park Police interfered with rescue efforts. Accordingly, I dissent from the majority's holding that the government was legally blameless.

### I. Discussion

The trial court refused to let this case go to trial, disposing of it on the government's motion for summary judgment. In opposition to the government's motion, appellants introduced several witness statements and affidavits from disinterested eyewitnesses to corroborate their allegations that the government was culpable. In support of its motion, the government introduced a sworn statement from Sgt. Thomas Wilkins indicating that the Park Police acted expeditiously and did everything possible to rescue Andrews. It is undisputed, however, that the officers did prevent a private rescue effort that was much more likely to succeed than their feeble efforts made from the shore.

The district court granted summary judgment to the United States because it found that: (1) Andrews was contributorily negligent, evidenced by his flight from arrest, intoxication, and swimming in the Washington Channel in violation of federal regulations; (2) this contributory negligence barred application of the "negligent rescue" doctrine; (3) the lack of evidence of initial negligence by the defendants made

the "last clear chance" doctrine inapplicable; and finally (4) the plaintiffs had not submitted sufficient evidence of willful or wanton misconduct by the Park Police. While I agree that the claims alleging chase and failure to initiate rescue were properly decided, the other claims concerning interference with rescue are much more compelling.

District of Columbia law recognizes the doctrine of negligent rescue. *Cf. Remeikis v. Boss & Phelps, Inc.*, 419 A.2d 986, 991 (D.C.1980) ("One who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." (internal quotation marks and citation omitted)). *See also*, RESTATEMENT (SECOND) OF TORTS § 323 (1965). Whether or not they initially owed any duty to rescue Andrews, the Park Police had a duty to act in a non-negligent, reasonable fashion once such a rescue was undertaken. Arbitrarily preventing a private rescue effort that had the greatest likelihood of success constituted a breach of that duty. If the police botched an opportunity to save Andrews from his predicament by stopping Ms. Sozio from her rescue efforts, the negligent rescue doctrine clearly would apply. Although the Park Police also owed the Sozios a countervailing duty not to endanger their lives as part of the rescue operations, the stated reason given by the Park Police as to why Ms. Sozio should not proceed further was not true, as discussed more fully below.

The interference with Sozio's private rescue efforts stands alone as an act of negligence to which the prior contributory negligence of Andrews is irrelevant. Contributory negligence does not automatically bar recovery under a negligent rescue theory unless it is continuing.

It is incumbent on the part of such a plaintiff to act with due care not to make his predicament worse once succor is on the way, but the volunteer who defaults in his duty once assumed to assist with due care cannot evade liability by pointing to the fact that the plaintiff in peril brought his troubles on himself to begin with.

*Federal Deposit Insurance Corp. v. Thomas W. Perry, Inc.*, 634 F.Supp. 349, 354 (D.D.C.1986). The district court rejected such an approach, insisting that Andrews "continue[d] his negligence during the rescue attempt." Mem.Op. at 10–11. It is hard to define what Andrews did that constituted continuing negligence at the time of the Sozio rescue effort. Was it Andrews' failure to revive himself from unconsciousness? Was it his failure to reflexively reach out for Ms. Sozio's leg despite his unconsciousness? The relevant question is whether any negligent act of the victim, "whether occurring before or after the accident, relates to the rescue and either worsens the victim's condition or hinders the rescue." *Berg v. Chevron U.S.A., Inc.*, 759 F.2d 1425, 1431 (9th Cir.1985). The illegal entry into the Channel was complete, and Andrews was no longer fleeing arrest (he had begun to swim back) when Sgt. Wilkins threw the life preserver. The sole "continuing" contributory negligence by Andrews that arguably worsened his position and hindered rescue was his intoxication. Even if that would cut off any liability for the alleged lack of due care in throwing the life preserver, Andrews was already unconscious at the time Ms. Sozio was instructed not to rescue him. Thus, no aspect of Andrews' contributory negligence could worsen his peril any further and, but for the officers' instructions, Ms. Sozio may still have been able to resuscitate him. The majority is noticeably silent on this issue.

Appellants also tried to avoid the contributory negligence barrier by arguing that the officers had acted in a willful or wanton fashion. The district court determined that there was no evidence of such conduct. While that conclusion may be appropriate when looking at the initial conduct of the Park Police, the record was replete with evidence that the Park Police had acted in a most disturbing manner when warning Ms. Sozio to desist in her rescue attempt. The district court simply concluded that the fact "that the park police prevented Jennifer Sozio from attempting a swim rescue cannot give rise to a claim of willfulness or wantonness." Willfulness does not require

an actual intent to cause injury but can be a conscious indifference to consequences under circumstances likely to cause harm. *Bohannon v. District of Columbia Dep't of Motor Vehicles*, 288 A.2d 672, 675 (D.C. 1972). There is evidence from several disinterested eyewitnesses suggesting indifference by the Park Police. *See* Witness Statement of George A. Sozio (May 20, 1987), at 2 (commenting on the officers' "very casual" conduct); Affidavit of Bill Sheffey, at 1 (describing the rescue efforts as "nonchalant"); Affidavit of Jay F. Warthen, at 3–5 (describing officers' "reluctance" and apparent intent to punish Andrews); Affidavit of Joanna M. Davis, at 2. While such descriptions may not by themselves create a genuine factual dispute concerning the alleged negligence of the Park Police in undertaking their own rescue efforts, these statements certainly raise an issue about the officers' motivation in cutting off the Sozio rescue attempt because the warnings to Ms. Sozio that Gino Andrews was an "escaped prisoner [who] could be dangerous" were patently untrue.

These eyewitness accounts were dismissed, however, on the strength of the sworn statement by Sergeant Wilkins that the police did everything possible to save Andrews. The majority gives no recognition to the clear stricture that in summary judgment review, the non-moving party gets the benefit of the doubt on any disputed facts. Instead, my colleagues "conjecture" about what may have motivated the officers to tell Jennifer Sozio that Andrews was an escaped and dangerous prisoner. *See* Maj.Op. at 99. The majority would deem Andrews' "arrest" and flight as a sufficient basis for loosely describing him as an escaped prisoner, but Andrews was never actually arrested for urinating in public. *See California v. Hodari D.*, —— U.S. ——, ——, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) ("An arrest requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of authority."). This might well have been a different case if the officers only yelled to Ms. Sozio that she should not go in because of the treacherous undercurrents, but the inaccurate description of Andrews, com-

bined with other evidence that the police may have been acting vindictively toward him, at least creates a colorable claim of willful and wanton misconduct.

This case resembles *Ross v. United States*, 910 F.2d 1422 (7th Cir.1990), where the court decided that the "plaintiff has pleaded sufficient facts for a jury to conclude that [the officers] acted in a reckless manner." *Id.* at 1433. Although the focus of that decision related to alleged constitutional torts, the court's treatment of the facts in that case provides us with some useful parallels, notwithstanding the majority's strained effort to distinguish the case. *See* Maj.Op. at 98–99. In *Ross*, the officer on the scene "knew there was a substantial risk of death yet chose a course of action that ignored the risk." 910 F.2d at 1433 (deeming such conduct "reckless"). This seems like a question that should be left for the fact-finder. *See Mandel v. United States*, 719 F.2d 963, 967–68 (8th Cir.1983) (reversing summary judgment because there was a genuine issue of material fact concerning alleged willful misconduct by National Park Service personnel when they suggested that a patron could swim in what proved to be a hazardous area).

## II. Conclusion

A somewhat harmless misdemeanor formed the causal nexus for a tragic death. There is no law or precedent which requires the United States to compensate the aggrieved family for every such unfortunate incident. But the law and precedents are clear that the United States is responsible when its agents act in a negligent fashion. There was enough in this record to put the United States to the task of defending the conduct of its officers at trial, rather than passing through the summary judgment road to absolution of blame. I would remand to allow appellants an opportunity to prove their common law tort claims against the United States.