**Glenn HERMANN, Plaintiff,**

v.

**Robin COOK, et al., Defendants.**

**Civil Action No. 3:01CV–524–H.**

United States District Court,
W.D. Kentucky.

Jan. 22, 2003.

J. Michael Brown, Sr., Steven L. Snyder, Robert J. Theuerkauf, Wyatt, Tarrant & Combs, Louisville, KY, for defendants.

## MEMORANDUM OPINION

JOHN G. HEYBURN II, Chief Judge.

Louis Wade Hermann ("Hermann") while under arrest and handcuffed, ran from his arresting officers, dove into the Ohio River and tragically drowned. Although the Defendant officers called for emergency help, they did not make any attempt to rescue Hermann, and in fact prevented bystanders from doing so. Hermann's estate has sued the officers on several grounds: Count I alleges that Defendants interfered with private efforts in violation of his due process rights; Count II alleges unreasonable seizure; Count III alleges state law negligence; Count IV alleges that the City of Louisville Police Departments's policies were unconstitutional; and Count V is a punitive damage claim.

Discovery is complete and Defendants have moved for summary judgment. This is one of those cases in which one can legitimately debate how the officers should have best responded to these emergency circumstances. However, the constitutional issues are entirely more straightforward. The central constitutional question is whether one in custody in these circumstances may assert claims based on a substantive due process right to rescue. The Court concludes that no such constitutional right is clearly established and, therefore, Plaintiff's complaint must be dismissed.

### I.

The relevant facts are mostly undisputed. Those few that may be disputed, the Court will consider in Plaintiff's favor. *See Matsushita Elec. Indus. Co. v. Zenith*

David A. Friedman, Fernandez, Friedman, Grossman & Kohn, Louisville, KY, for plaintiff.

*Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

On September 16, 2000, the City of Louisville sponsored a free concert at Waterfront Park adjacent to the Ohio River. Louisville Police Detective David Sanford and his partner Detective John Tarter arrived at Waterfront Park around 10:30 p.m. to provide general security coverage. They later joined Officer Kristen Anderson near the stage. At some point, an individual approached Sanford and Anderson and reported that one of the concert goers was causing problems.

Anderson and Sanford traversed toward the west side of the park to look for the individual. The person who had reported the problem identified the concert goer as Hermann. At the time Anderson saw him, Hermann was walking away from the vendors and toward the stage. Anderson touched Hermann's arm and engaged him in general conversation to attract his attention. It was obvious to the officers that Hermann was inebriated—his eyes were glassy and he smelled like beer.

Anderson tried to persuade Hermann that he had had enough to drink. Hermann disagreed and pulled his beer away. Anderson told Hermann that he should leave the concert, but Hermann refused. After these initial efforts failed, Anderson and Sanford led Hermann away from the concert and continued talking with him. Still inebriated and apparently upset by the police attention, Hermann refused to leave the scene. Anderson then decided to arrest Hermann and handcuffed his wrists behind his back. The arrest apparently did not improve Hermann's disposition. He continued to complain. Anderson needed an arrest slip to complete the arrest. Sanford said that he would watch Hermann while Anderson tried to locate one. After Anderson left, Sanford allowed Hermann to sit down next to the pillar.

In the meantime, Anderson located Officer Robin Cook, who also was providing security at the concert, and asked her for a citation book. Cook said that her book was in her police cruiser, parked next to Joe's Crab Shack. The two officers walked to the cruiser to retrieve the citation book. They then walked back to Hermann. Tarter was also present. Anderson radioed the police dispatcher to request a beat car to transport Hermann to the jail. By this time, considerable time had passed since the arrest. None of the officers noticed anything unusual about Hermann's behavior. Sanford thought Hermann's behavior "wasn't un-ordinary" for an intoxicated person just arrested. Tarter felt Hermann was acting like the typical male who has had a bit too much to drink. Cook thought that Hermann was acting in an "average" fashion for an intoxicated man under arrest. No evidence suggests that Hermann was about to run from the police.

As soon as Cook finished patting down Hermann, she moved off to the side and started chatting with Tarter. While Anderson completed the paperwork, Hermann remained standing. He complained about the handcuffs being too tight. To make him more comfortable, Sanford loosened one of the cuffs. Anderson had almost finished with the arrest slip when Hermann asked, "Am I going to jail?". Sanford and Anderson both replied "yes." Immediately thereafter, Hermann "started to sprint toward the river." All descriptions of the event are similar. In Cook's words, "Mr. Hermann bolted, I mean literally bolted, took off running as fast as he could northbound into the river." Sanford tried to grab Hermann but missed. He then chased after Hermann, followed by Anderson and Cook. Sanford yelled at Hermann to stop and also "Don't do it! Don't do it!" as Hermann headed toward the river. Tarter was not aware of the

events until he heard Sanford yell. Thereafter, Tarter immediately started to run after Hermann. Hermann ran in a diagonal line, covering about fifty feet before he came to the water's edge. Without an apparent second thought, he jumped or ran straight into the Ohio River. The officers closest to the scene described Hermann as diving into the Ohio River headfirst. However, Tarter, who was in the rear, believes Hermann entered the river feet first. Regardless, Hermann immediately disappeared into the water. No one observed Hermann resurface.

The river at this site was about 10 feet deep. The water was muddy, dark and debris was typical in the area. Ropes, life preservers and boats were in the nearby area and could have been available for a rescue attempt. Sanford, and perhaps others, immediately radioed the police dispatcher to request the EMS and the Fire & Rescue's dive team. Tarter took off his jacket, tie, and weapon, preparing to jump in the river after Hermann. Sanford stopped him. Tarter said later that he realized jumping in the river would have been foolish and dangerous. Neither Sanford nor Cook considered themselves good swimmers. Anderson considered whether to jump in the river, but decided not to do so when Hermann very quickly disappeared from sight.

Officer Ron Charles, a certified diver who sometimes works with the Fire & Rescue dive team, arrived on the scene within moments of Hermann's disappearance into the river. Charles was on bike patrol and was not wearing his diving equipment. He took off his gun, belt and shirt, but waited until his diving equipment arrived to enter the water. Meanwhile, Cook and Tarter secured the area from civilians with yellow police tape. Several of the officers watched the spot where Hermann entered the river. None of them saw Hermann resurface.

One of the concert goers, Del Rainwater, ran to the scene and offered to jump into the river and attempt a rescue. Rainwater told police that he had water rescue experience. Although Rainwater believed that a timely rescue was possible, one of the officers prevented him from doing so. While at the scene, Rainwater heard one of the officers say to another about a possible rescue attempt, "Don't bother, it's just another felon out of the way." EMS and the Fire & Rescue's dive team arrived about 15 to 20 minutes after the incident. Charles assisted the rescue team in retrieving Hermann's body from the river.

## II.

Admittedly, the circumstances here are rather bizarre and certainly tragic. Nevertheless, the Court concludes that the case is resolved soundly on the grounds of qualified immunity.

 Qualified immunity is an affirmative defense that shields government officials performing discretionary functions from liability for civil damages where their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "[T]he rationale for the qualified immunity historically granted to the police rests on the difficult and delicate judgments these officers must often make." *Foley v. Connelie*, 435 U.S. 291, 299, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978). "If the law was not clearly established, it is impossible to find that the defendant knew that the law forbade his or her conduct." *Daugherty v. Campbell*, 935 F.2d 780, 783 (6th Cir.1991). Defendants bear the burden of pleading the qualified immunity defense, but Plaintiff bears the burden of showing that Defendants' conduct violated a right so clearly established that a rea-

sonable official would have clearly understood that he or she was under an affirmative duty to refrain from such conduct. *See Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992). The ultimate burden of proof is on Plaintiff to show that Defendants are not entitled to qualified immunity. *Sheets v. Mullins,* 287 F.3d 581, 586 (6th Cir.2002).

The Supreme Court has said that, in deciding whether an official is entitled to qualified immunity, the first step in the analysis is deciding whether there has been a violation of a constitutional right in the first instance. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (explaining that "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all").

Here, the analysis of whether Plaintiff has asserted a violation of a constitutional right begins with the Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Soc. Serv.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* the petitioner, the mother of a child who had been beaten by his father, brought a civil rights action against various social workers and local police who failed to remove the child from his father's custody after receiving complaints that the father was abusing the boy. *See id.* Although the Supreme Court ultimately rejected the petitioners' claim, it recognized as a general proposition that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200, 109 S.Ct. 998. Thus, the State's failure to act in certain circumstances may violate a person's substantive due process

rights. *Id.* Of course, *DeShaney* does not directly control our case.

A rather clear boundary appears to mark the extent of affirmative action which the Due Process Clause requires of a state actor. The Sixth Circuit has interpreted *DeShaney* to say that the Due Process Clause generally does not confer an affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual. *See Jones v. Union County, TN,* 296 F.3d 417, 427 (6th Cir.2002). Nonetheless, an affirmative right to governmental aid may arise in exceptional circumstances. The Sixth Circuit has recognized at least two such exceptions to the general rule that the Due Process Clause does not create an affirmative duty to protect. *See id.* at 428. The first, or "special relationship" exception, applies when the state restrains an individual in a way that exposes the individual to harm. *See Sargi v. Kent City Bd. of Ed.,* 70 F.3d 907, 910–11 (6th Cir.1995). The second, which seems to be somewhat similar, applies when the state through some affirmative conduct places the individual in a position of danger. *See Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir.1998).

■ Here, the Court finds neither a special relationship which restrained Hermann so as to expose him to harm, nor any affirmative conduct on Defendants' part placing him in greater danger. Defendants held Hermann in custody in an entirely appropriate manner. Neither Hermann's conduct nor the circumstances required the need for greater restraint; Defendants took no affirmative action to place him in greater danger. Nor can anyone reasonably say that Defendants caused the kind of "special danger" which the Sixth Circuit has said is necessary to create an affirmative duty. *Jones,* 296 F.3d at 430. Only Hermann's unexpected

attempted escape and dash into the Ohio River created the circumstances of his death.

Most important, no existing legal authority would lead a reasonable officer to believe that by failing to attempt a rescue under these or similar circumstances, the officer violated a prisoner's substantive due process rights. *See Andrews v. Wilkins*, 934 F.2d 1267, 1270 (D.C.Cir.1991), overruled on other grounds, *Atchinson v. District of Columbia*, 78 F.3d 418 (D.C.Cir. 1996). Certainly no such right is clearly established. Indeed, more than likely, it does not exist at all under these circumstances. As previously discussed, the general rule is that police officers are not affirmatively required to rescue one who is in danger, particularly where the rescue might be dangerous.

At first blush, the remaining issue may appear unclear. After all, one might think that the officers were wrong to stop a bystander from attempting a private rescue. However, it is easy to think of sound public safety reasons for the officers to prevent even more tragedy by preventing rescues until trained personnel arrived. Moreover, the Court finds some authority that police have a right to stop unqualified persons from attempting dangerous rescues. *Franklin v. City of Boise*, 806 F.Supp. 879, 888 (D.Idaho, 1992); *Andrews*, 934 F.2d at 1267. The *Andrews* case is quite similar to ours[1] and Judge Sentelle's comments are particularly persuasive on this last issue:

> While it should have been clear to the police that they could not "arbitrarily assert [their] powers so as to cut short a

person's life," ..., it certainly could not have been clear to them that they were required to refrain from taking any action when a private citizen, drawn into a police rescue operation, was about to expose herself to substantial danger, of which she was not completely aware. Whatever constitutional right to unhindered private rescue efforts Andrews may have had, it was by no means clearly established that such a right precluded the police efforts directed at the safety of the potential private rescuer. Thus, appellants do not state a cognizable constitutional tort claim in this case. *Id.* at 1271. For purposes of this case, this Court agrees that no officer could reasonably believe that such action would violate Hermann's clearly established constitutional rights.

One can certainly debate about the best course of action for the police and bystanders to have taken. Reasonable arguments might support a decision for any number of possible actions. That is the judgment call which the officers must make on the scene. Whether additional efforts would have actually proved successful or would only have cost the lives of police officers or bystanders can never be known. What is absolutely clear is that the Defendants did not violate Hermann's constitutional rights by making the reasonable judgment that neither they nor innocent bystanders should attempt a rescue before trained personnel arrived.[2] For these reasons, Plaintiff's federal claims against the individual Defendants must be dismissed.

---

1. *Andrews* involved an individual who fled after arrest but prior to being handcuffed. He ran into the Washington Channel of the Potomac River. The chasing officer tried to throw a life ring, but declined to go into the water to rescue the prisoner. The prisoner drowned.

2. Rainwater's testimony that one of the officers told another "don't bother [rescuing Her-

mann]; it's just another felon out of the way" is worth some mention, though Plaintiff did not mention or argue it in his brief. The Court suspects that the reason for its omission is that the remarks, though potentially inflammatory and disgusting, if true, add nothing to the qualified immunity analysis. Plaintiff does not make and the Court does not see an argument for its significance.

### III.

The remaining claims are easily resolved.

■ First, the Court can find no evidence that Defendants followed any particular City of Louisville Police policy which violated Hermann's substantive due process rights by failing to rescue. Even assuming the City of Louisville had such a policy, which Defendants followed, no constitutional violation exists.

■ Second, Plaintiff makes no creditable argument that Defendants arrest of Hermann somehow constituted an unreasonable seizure. Defendants made reasonable, though unsuccessful, attempts to resolve Hermann's conduct without arrest. Certainly, Defendants have probable cause to believe that an arrest was necessary, and the manner in which they effectuated the arrest appears reasonable, and supported by probable cause under the circumstances.

■ Finally, Hermann's state law negligence claim fails for the same reasons as that of the substantive due process claim. Plaintiff has failed to establish that Defendants owed Hermann a duty either to impose greater restraint to prevent his escape or to pursue a rescue or allow bystanders to do so. As for Plaintiff's first contention, "it can hardly be said that officers having a prisoner in their custody owe him … the duty of preventing his escape." *McFarland v. Ellison,* 266 Ky. 628, 99 S.W.2d 779, 780 (1936). The officers were entitled to assume that under these circumstances, handcuffs were a sufficient means of restraint. The officers certainly had no duty to restrain Plaintiff in a police cruiser or place his legs in shackles. As for Plaintiff's second contention, the Court can find no cases stating that officers in these circumstances had a duty to pursue a rescue or had a duty to allow bystanders to pursue a potentially dangerous rescue. In fact, long ago the Kentucky Supreme Court stated that police officers "are not charged with the duty of risking their own lives in an effort to rescue a prisoner whose predicament was due solely to his own act in trying to escape." *Id.* at 780. Being unable to set forth a duty under the law, Hermann cannot state a cause of action in tort. *See Commonwealth Transp. Cabinet, Bureau of Highways v. Roof,* 913 S.W.2d 322, 324 (Ky.1996).

The Count V punitive damage claim fails as a matter of course.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

Defendants have moved for summary judgment on all claims. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion for summary judgment is SUSTAINED and Plaintiff's complaint is DISMISSED WITH PREJUDICE.

This is a final and appealable order.