**DISTRICT OF COLUMBIA,**
**Appellant/Cross–**
**Appellee,**

v.

**William WALKER, Appellee/Cross–**
**Appellant.**

**DISTRICT OF COLUMBIA, Appellant,**

v.

**Patricia TOBEY, Appellee.**

**Nos. 93–CV–113, 94–CV–**
**14 and 94–CV–1309.**

District of Columbia Court of Appeals.

Argued April 23, 1996.
Decided Feb. 6, 1997.

Donna M. Murasky, Assistant Corporation Counsel, with whom Vanessa Ruiz, Corporation Counsel at the time the brief was filed, Garland Pinkston, Acting Corporation Counsel at the time the reply brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the briefs, for District of Columbia.

Marc I. Fiedler, with whom Joseph H. Koonz, Jr., Paulette E. Chapman and Victor E. Long, Washington, were on the brief, for William Walker and Patricia Tobey.

Before WAGNER, Chief Judge, and STEADMAN and KING, Associate Judges.

STEADMAN, Associate Judge:

These consolidated appeals involve the extent of the District's liability for high-speed chases by its law enforcement personnel. We set aside the judgments entered against the District in both cases.

## I.

A juvenile driving a stolen car was pursued by Metropolitan Police Department (MPD) officers through the District of Columbia and into Maryland via Suitland Parkway, where the juvenile collided with another car and killed the driver, Terry Proctor Walker. Mrs. Walker's husband, William Walker, sued the District under Maryland's wrongful death and survival statutes,[1] alleging gross negligence in the MPD officers' pursuit of the stolen car and negligence in the MPD's training of the officers regarding proper pursuit procedures. After a trial, the jury found for Mr. Walker on both claims. The District moved for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. The trial court denied the motion.

---

1. Md.Code Ann., Cts. & Jud. Proc. § 3–904 (1991); Md.Code Ann., Est. & Trusts § 7–401(x) (1991). Mrs. Walker was a resident of Maryland. Mr. Walker was the personal representative of her estate.

In a separate action [2], Patricia Tobey—the guardian of Ray Brown, Mrs. Walker's son—filed a complaint against the District for wrongful death, making the same allegations that Mr. Walker made in his complaint. Taking note of the outcome of Mr. Walker's action, the trial court granted Tobey's motion for summary judgment on the issue of liability, based on a collateral estoppel theory. After a trial and jury verdict on the issue of Tobey's damages, the District filed a motion for JNOV or, in the alternative, a new trial or remittitur. The trial court denied the motion. The District appeals from the denials of its motions for JNOV in the Walker and Tobey cases.[3]

■ Under the District of Columbia Employee Non–Liability Act, the District has waived its governmental immunity to damage suits for personal injury or death caused by the negligent or wrongful operation of a District vehicle by a District employee acting within the scope of employment. D.C.Code § 1–1212 (1992 Repl.). However, § 1–1212 expressly limits the waiver by providing that "in the case of a claim arising out of the operation of an emergency vehicle on an emergency run the District shall be liable only for gross negligence." As we noted in another case involving § 1–1212, "generally ... waivers of immunity are to be read narrowly." *Abney v. District of Columbia*, 580 A.2d 1036, 1041 (D.C.1990). The necessary corollary to this rule is that limitations on waivers of immunity, such as the gross negligence provision in § 1–1212, are to be read broadly.

The District makes two dispositive arguments on appeal, both based on the gross negligence limitation of the Act. First, the District argues that, as a matter of law, the MPD officers' conduct did not amount to gross negligence, and therefore the District cannot be held liable for any injury resulting from the pursuit. Second, the District argues that, since it cannot be held directly liable for the collision based on the conduct of the MPD officers involved in the pursuit unless that conduct was grossly negligent, liability cannot be indirectly imposed based on the officers' training. We agree with the District on both issues.

## II.

We turn first to the District's argument that, as a matter of law, the MPD officers' conduct in this case did not constitute gross negligence.

### A.

■ In reviewing the denials of the District's motions for JNOV, we view the evidence in the light most favorable to the appellees, and "[w]e reverse only if no reasonable juror could have reached the verdict." *Kane v. Ryan*, 596 A.2d 562, 564

---

2. This separate action on behalf of Mrs. Walker's son was brought following a trial court ruling that the son had not been properly made a party to the prior suit by Mr. Walker. The trial court stated that it saw "no barrier to you filing another law suit for the child." This ruling was the subject of the cross-appeal, in which the cross-appellant cited to the provision of the Maryland Wrongful Death statute that states that "[o]nly one action under this subtitle [i.e., Wrongful Death] lies in respect to the death of a person." Md.Code Ann., Cts. & Jud. Proc. § 3–904(f) (1991). We believe we need not now decide this issue, given our determination on the question of the District's liability. (Appeal No. 94–CV–14 is an appeal taken by the District from the trial court's order extending the time within which Walker could file his cross-appeal. This issue is not discussed in the District's brief and is therefore considered abandoned.)

3. *Although the trial in the Tobey case was limited to the issue of damages,* the District's motion for JNOV argued that the judgment in the Walker

case was erroneous and thus should not be relied upon for collateral estoppel purposes. The appeals in both the Walker and Tobey cases were consolidated, but briefs were filed only in the Walker case. As noted in our order of March 5, 1996, setting the case for oral argument, the District abandoned all issues presented solely in the Tobey appeal and the parties agreed that the only remaining issues to be now addressed on appeal were those presented in the District's Walker's brief; viz., those addressed in parts II and III of this opinion, which are also involved in the Tobey appeal. With matters in this posture and in light of our holding with respect to the District's liability in the Walker case, which was the basis for the judgment against the District in the Tobey case, we believe the appropriate course of action with respect to the Tobey case is to vacate the judgment in favor of Tobey and to remand for further action, if any.

(D.C.1991) (citations omitted). The basic facts of the pursuit, viewed in the light most favorable to appellees, are as follows.[4]

While driving a marked police car in Southeast Washington at approximately 1:30 p.m. on Saturday, February 9, 1991, MPD Officer Paul Wingate noticed a Toyota car with a driver and passenger who looked "rather young."[5] Wingate began following the Toyota, without activating his lights or siren, and remained about two car lengths behind it. After learning that the Toyota had been reported stolen, Wingate decided to attempt to stop it, and radioed for assistance. Along with another police car driven by MPD Officer Teresa Butts and a police wagon, Wingate attempted to "box in" the Toyota at a stop sign on the corner of Sixth Street and Mississippi Avenue, near a junior high school. The attempt failed, however, and the Toyota turned left onto Sixth Street. Wingate activated his lights and siren and pursued the Toyota, with Butts following. The Toyota proceeded along Sixth Street in the wrong direction when the street turned one-way for a block, and Wingate and Butts continued to follow in their police cars. The Toyota then turned right onto Alabama Avenue, where its speed reached approximately fifty miles per hour, and it went through two or more red traffic lights, with Wingate and Butts following. The area in which this portion of the pursuit took place is partly residential and partly commercial in character.

The Toyota then entered Suitland Parkway, driving over a sidewalk or a bump, and fishtailing "a little bit" as it passed over gravel at the beginning of the entrance ramp, momentarily losing control. The Toyota continued to accelerate, reaching a speed of approximately ninety miles per hour. The Toyota, followed by Wingate and then Butts, with their lights and sirens activated, crossed the District–Maryland line into Prince George's County, Maryland. The MPD dis-

patcher had notified the Prince George's County police of the chase; a Prince George's police officer entered Suitland Parkway at Silver Hill Road in a marked police car and joined the pursuit. The Prince George's police car had its lights and siren activated, and was positioned between the Toyota and the MPD police cars. The three police cars were as close as five car lengths behind the Toyota. After Wingate radioed to the police dispatcher that the Prince George's County police were involved, the MPD deputy chief ordered Wingate to cease the pursuit.

The collision occurred within a minute or less after the Prince George's County police car entered the chase, approximately one-half mile after Silver Hill Road. The juvenile driver of the Toyota, who survived the collision, testified that prior to the collision, he noticed the Prince George's police car behind him, "right on [his] bumper." Shortly before the collision, Suitland Parkway had changed from a four-lane road divided by a grassy median strip into a two-lane road divided by a double yellow line. The Toyota crossed the double yellow line and pulled into the lane of oncoming traffic in order to pass three cars ahead of it. After clearing the three cars, the Toyota remained in the wrong lane and struck an oncoming car. According to the driver of the Toyota, he tried to return to the right lane prior to the collision, but his passenger grabbed his arm so that he lost control of the steering wheel until it was too late. Mrs. Walker, who was driving the oncoming car, died as a result of the collision.

The entire chase covered approximately five miles. Traffic was light, and the road conditions were clear and dry. A map introduced into evidence showed that the collision occurred about 2½ miles beyond the District line, and that there was access in this stretch of Suitland Parkway from only three streets (Naylor Road, Branch Avenue, and Silver

---

4. There was very little dispute over the relevant facts of the pursuit. The principal areas of divergence lay in whether the MPD officers ceased the pursuit when ordered to do so, and in the distance between the pursued car and the police cars while on Suitland Parkway, neither of which went directly to the accident itself. By the time the MPD officers were ordered to cease the pursuit, shortly before the collision, a police car

from Prince George's County, Maryland had interposed itself directly behind the stolen car. The real dispute is over whether the largely undisputed facts constitute gross negligence under the meaning of the statute.

5. The driver turned out to be fourteen years old.

Hill Road), the last two of which were by access ramps.

The area in which the collision occurred contained no cross streets and no pedestrians. The driver of the Toyota testified that he wanted to stop the car and run away at various points during the pursuit, but the police did not give him a chance to do so. Although the MPD helicopter was notified of the chase, it apparently did not reach the area to provide assistance.

### B.

The Employee Non–Liability Act is itself silent as to the definition of gross negligence in its application.[6] The jury in Mr. Walker's case was instructed without objection that "[g]ross negligence occurs when a person is acting with a wanton, willful and reckless disregard or conscious indifference for the rights and safety of others." The scope and meaning of this formulation can be illuminated by an examination of relevant case law. While we have never interpreted the concept of gross negligence in the context of emergency vehicle operation, we have defined the general concept of gross negligence as "[t]he failure to exercise even slight care," and "such negligence as would shock fair-minded men." *Shea v. Fridley*, 123 A.2d 358, 363 (D.C.1956) (internal quotation, citations, and footnote omitted). Similarly, the United States Court of Appeals for this circuit has stated that "gross negligence implies an 'extreme departure from the ordinary standard of care.'" *Wager v. Pro*, 195 U.S.App. D.C. 423, 428, 603 F.2d 1005, 1010 (1979) (quoting W. PROSSER, LAW OF TORTS, § 8, at 31 (1971)). We have applied Maryland law to define gross negligence in the driving context as "a wanton or reckless disregard for human life or for the rights of others," and "indifference to the consequences ... [which] implies malice and evil intention." *Hall v. Hague*, 257 A.2d 221, 223 (D.C.1969) (citations omitted). In addition, while not using the term "gross negligence," we have said in the context of the conduct necessary to revoke an operator's permit that willfulness and wantonness in driving "require[s] a conscious indifference to consequences under circumstances likely to cause harm." *Bohannon v. District of Columbia Dep't of Motor Vehicles*, 288 A.2d 672, 675 (D.C.1972). And our federal court of appeals, applying what it apparently perceived to be District law, has said that, "[t]o constitute willful or wanton negligence, the police actions must involve 'such reckless disregard of security and right as to imply bad faith.'" *Andrews v. Wilkins*, 290 U.S.App. D.C. 95, 100, 934 F.2d 1267, 1272 (1991) (quoting 3 S. SPEISER, *et al.*, THE AMERICAN LAW OF TORTS, § 10.1, at 354 (1986)).[7]

Thus it can be said that the term "gross negligence" in § 1–1212 requires such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others. This standard has been held to connote that the actor has engaged in conduct so extreme as to imply some sort of bad faith. *See Andrews, supra*, 290 U.S.App. D.C. at 100, 934 F.2d at 1272; *Hall, supra*, 257 A.2d at 223. Where, as here, there is no evidence of subjective bad faith on the part of the actor, the extreme nature of the conduct may be shown by demonstrating that the actor acted in disregard of a risk "so obvious that [the actor] must be taken to be aware of it and so great as to make it highly

---

**6.** No one disputes the application of the gross negligence provision of § 1–1212 to the police pursuit in this case. It is undisputed that the MPD vehicles were emergency vehicles on emergency runs. *See* D.C.Code §§ 1–1211(4), (5) (1992 Repl.). And no one argues that the gross negligence provision of § 1–1212 has any less force with regard to events in Maryland than it has with regard to events in the District. *Cf. Biscoe v. Arlington County*, 238 U.S.App. D.C. 206, 210–16, 738 F.2d 1352, 1356–62 (1984) (discussing application of Virginia's sovereign immunity doctrine to suit in federal court arising from actions of Arlington County, Virginia police

in the District of Columbia), *cert. denied*, 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985).

**7.** *Andrews* involved a wrongful death action against police officials based on constitutional and common law torts, and the court was here addressing whether the plaintiffs had proven that the police conduct constituted willful or wanton negligence. *See also* D.C.Code § 4–162 (1994 Repl.) (defining gross negligence, for purposes of the MPD's handling of seized property, as "a willful intent to injure ... or a reckless or wanton disregard of the rights of another").

probable that harm would follow." 3 S. SPEISER, *et al.*, THE AMERICAN LAW OF TORTS, § 10.2, at 361 (1986).

We also note that while no one argues that the Maryland definition of gross negligence should have applied in this case, we discern no relevant distinction between Maryland and D.C. law in this regard. *See Boyer v. State*, 323 Md. 558, 594 A.2d 121, 132 (1991) (gross negligence in context of police conduct during pursuit requires "a wanton and reckless disregard for others").[8]

## C.

In any negligence claim, the plaintiff must establish "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988) (internal quotation and citations omitted). In this case, a useful beginning point for analysis may be to examine the standard of care which must be breached in order even for simple negligence to be found. This standard of care can thus constitute a base point from which the magnitude of deviation can be assessed for purposes of the gross negligence inquiry.

At trial, Mr. Walker called two expert witnesses in the field of police science. As described by Mr. Walker's experts, the national standard of care requires the police, in deciding whether to initiate and continue a pursuit, "to weigh the urgency of making an immediate apprehension of someone in a vehicular pursuit against the foreseeable risk of death or injury to everyone involved." The factors to be considered in this balancing test include the nature of the area, the time of day, the age of the driver of the pursued vehicle, the actions of the driver, and the road and weather conditions. The standard described by Mr. Walker's expert witnesses is essentially equivalent to that recognized by other courts, which calls for consideration of a number of factors, including "the length, characteristics, and speed of the pursuit; the area of the pursuit, whether rural or urban; the highway characteristics such as curves or no passing zones; the presence of pedestrians and traffic; weather and visibility; and the seriousness of the law violation." *Peak v. Ratliff*, 185 W.Va. 548, 408 S.E.2d 300, 308 (1991) (collecting cases; footnote and citations omitted); *see also Boyer, supra* note 8, 594 A.2d at 137 (police "must take into account a number of factors, such as road conditions, vehicular traffic, pedestrian traffic, time of day, weather, [and] dangerousness of the person fleeing"). The District argues that the evidence did not establish that the MPD officers in this case were grossly negligent with reference to that standard.

Mr. Walker's expert witnesses pointed to various factors in this case which, in their opinion, made it grossly negligent for the MPD officers to pursue the Toyota: the time of day and week (Saturday afternoon), indicating a lot of vehicular and pedestrian traffic; the urban nature of the area in which the pursuit began; the speed involved; the young age of the driver; the fishtailing of the Toyota as it entered Suitland Parkway; the officers' "mimicking" of the driver's behavior in running red lights on Alabama Avenue and driving the wrong way on the one-way portion of Sixth Street; the officers' failure to comply with requirements in MPD General Order 301.3 regarding approaches to traffic lights; the fact that the driver's traffic violations did not begin until after the police began pursuing him; and the lack of seriousness of the offense, which lowered the need for immediate apprehension.[9] The experts

8. *See also Hall, supra*, 257 A.2d at 223 (applying Maryland law).

9. In addition, according to one of the expert's review of the evidence, notwithstanding Officer Wingate's testimony to the contrary, the MPD officers did not cease the pursuit when ordered to do so after the Prince George's County officer joined the chase. However, we fail to see how such conduct could support a finding of liability, given the evidence that the collision occurred within one minute or less, and approximately one-half mile, after the Prince George's County police car's entry onto Suitland Parkway. Any causal connection between the collision and the MPD officers' alleged failure to cease their pursuit becomes even more remote in light of the testimony by the driver of the Toyota that he noticed the Prince George's police car directly behind him prior to the collision. Similarly, one of the experts testified that the MPD's alleged

testified that the police by their actions were "pushing" the driver of the Toyota, and one expert indicated that the officers should have given the driver an opportunity to elude them or to stop the Toyota and flee on foot.

■ The question in this case is not whether the MPD officers violated the national standard of care—*i.e.*, whether the need to apprehend the Toyota was outweighed by the foreseeable hazards of the pursuit. This might be the appropriate inquiry under an ordinary negligence standard. Under the gross negligence standard applicable here, the appropriate inquiry is whether, given the balance of the factors in this case, a reasonable juror could conclude that the conduct of the MPD officers so grossly deviated from the conduct required under the circumstances as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others.

■ In making this inquiry, it is essential to keep in mind that liability is not imposed upon proof of negligence in the abstract but only upon proof that the negligence charged was a proximate cause of the injury. In other words, the plaintiff must prove that the allegedly negligent conduct "played a substantial part in bringing about

the injur[y] and the injury was either a direct result or a reasonably probable consequence of the [conduct]." *Sanders v. Wright,* 642 A.2d 847, 850 (D.C.1994) (internal quotation, citations, and alterations omitted). Thus, here the primary focus must be not upon the conduct of the MPD officers in all its aspects, but only upon that particular conduct that might be said to have proximately caused the collision. Allegations that the officers acted in a grossly negligent manner in ways that did not, in the end, play a substantial part in bringing about the collision cannot form the basis for liability.[10]

Therefore, in deciding whether the conduct of the MPD officers could be found to constitute gross negligence, we necessarily focus in the first instance on Suitland Parkway, where the collision took place.[11] Even assuming solely for the purpose of argument but not deciding that the officers were grossly negligent at an earlier point in the pursuit due to the conditions on Sixth Street or Alabama Avenue, such gross negligence did not in itself cause any injury.

Therefore, the amount of vehicular and pedestrian traffic and the urban nature of Alabama Avenue nearly three miles from the site of the collision—while relevant insofar as

---

failure to conduct an "after-incident" report of the collision was a factor supporting gross negligence, but the MPD's post-collision conduct by definition can have no causal connection to the collision. *See generally Twyman v. Johnson,* 655 A.2d 850, 852 (D.C.1995) (plaintiff must prove causal connection between injury and defendant's breach of duty).

10. Both of Mr. Walker's expert witnesses expressed the opinion that the MPD officers' conduct in pursuing the Toyota was grossly negligent, and that the officers' gross negligence was a substantial factor contributing to the collision. Dr. George Kirkham characterized the officers' conduct as "grossly negligent, heedless, reckless, heedless of human life and safety." Mr. Robert Klotz testified that, "[i]n my opinion ... [the officers' conduct] was gross negligence because there were so many [hazard] factors involved." The opinion of these experts is not determinative of our analysis, however, as the interpretation of the gross negligence standard in § 1–1212 is a question of law for the court.

With regard to causation, according to Kirkham, the police in a high-speed chase act as a catalyst for the pursued driver's behavior, in that

"[t]he driver of the fleeing vehicle is going to continue to flee as long as that police car is back there with its lights and siren." Similarly, according to Klotz, the police are pushing the driver of the vehicle [they] are chasing ... [and] are basically controlling the way [the pursued driver] drives the vehicle. The faster [the police] go the faster that that person is going to go. It may be that that person wants to do some other maneuvers like make a turn or something but if [the police] are too close behind him he doesn't feel that he has that ability left anymore[;] the only thing he is able to do is keep trying to elude [the police] by increasing his speed as [the police] increase speed.

We expressly do not reach the District's argument that, as a matter of law, no aspect of the MPD officers' conduct was the proximate cause of the collision.

11. *See Breck v. Cortez,* 141 Ill.App.3d 351, 95 Ill.Dec. 615, 621, 490 N.E.2d 88, 94 (1986) (where police pursuit covered approximately five miles and included various types of roads, court focused on area near scene of collision in deciding whether police conduct constituted willful and wanton negligence).

they show what the officers knew about how the driver of the Toyota might behave—have little bearing on whether the officers' conduct was grossly negligent in causing the collision. Moreover, the expert opinion that the officers in this case violated certain aspects of MPD General Order 301.3 when they approached traffic lights [12] also related to the officers' conduct before the pursuit entered Suitland Parkway.[13] And, while there was evidence that the police in this case "mimicked" the driver of the Toyota by driving the wrong way down a one-way street and driving through red lights, this evidence also related to conduct that occurred before the pursuit moved to Suitland Parkway.[14]

Viewing the situation from the immediate vantage point of Suitland Parkway prior to the collision, the police were faced with a driver proceeding down a divided limited access highway at a very high rate of speed where vehicular traffic was light, there were no pedestrians, and the conditions were clear and dry. Mr. Walker's own experts testified that the Prince George's police officer who assumed the chase was not at fault and his conduct was not hazardous in such circumstances. Therefore, appellees' case must in the main depend upon the proposition that what the MPD police officers *knew* as they

continued the chase in such circumstances, rather than what they *did*, converted action that otherwise would not be negligence at all into gross negligence. This is too great a leap on the record here.

To be sure, there were factors in this case that weighed against the pursuit. While the driver was known to be driving a stolen car and probably guilty of felonious activity, he was not suspected of any violent crime and was not observed committing any traffic violations until the pursuit commenced. Once the pursuit began, the driver—who appeared to be young—demonstrated his willingness to run red lights and drive the wrong way down a one-way street for one block, and his refusal to stop in the face of the police pursuit. In addition, he momentarily lost control of the Toyota when entering the parkway. Nevertheless, while the police knew that the driver was probably inexperienced and was willing to engage in some unlawful traffic behavior,[15] it cannot be said that the risk of injury or death here was so obvious and so great as to support a finding that the officers acted with wanton, willful and reckless disregard or conscious indifference for the rights and safety of others. This is particularly true in light of the evidence that, not only was the collision not the direct result of the officers' driving,[16]

12. The general order, which was admitted into evidence at Mr. Walker's trial, is an internal police guideline regarding the initiation and continuation of vehicular pursuits. The version of MPD General Order 301.3 in effect at the time of the police pursuit in this case provided, *inter alia*, that, "[w]hen approaching any intersection controlled by electric signal devices [,] an emergency vehicle shall (1)[s]top before entering the intersection when a red signal is displayed [and] (2)[s]low to the maximum legal speed when a green signal or a flashing yellow signal is displayed."

13. In any event, as we stated in *Abney, supra*, General Order 301.3 "essentially serves the purpose of an internal operating manual. It makes no mention of section 1–1212 nor does it in any other manner purport to implicate the District's waiver of governmental immunity." 580 A.2d at 1041. In *Abney*, we held that the definition of "emergency vehicle" in General Order 301.3 could not be used to expand the District's liability under § 1–1212. *Id.* Likewise, in this case, the general order cannot expand the District's liability beyond that authorized in the statute. While evidence that the police violated the general order was one factor that the jury could consider, liability would attach only if the MPD

officers were grossly negligent with reference to the national standard of care. *See District of Columbia v. Banks*, 646 A.2d 972, 983 (D.C.1994) (Farrell, J., concurring) (arguing that violation of General Order 301.3 in police pursuit could be considered by jury as one factor in deciding gross negligence issue, but could not in itself "support a finding of negligence, let alone gross negligence").

14. District emergency vehicles are expressly permitted to engage in such conduct when in pursuit of a suspected violator of the law, provided that the driver of the emergency vehicle "drive[s] with due regard for the safety of all persons." 18 DCMR § 2002 (1995).

15. These factors can cut both ways in the decision whether to continue pursuit. *See infra* note 17.

16. It should be noted that there was no evidence of erratic driving by the officers on Suitland Parkway, and that the officers had their emergency lights and sirens activated at all relevant times, thus providing some warning to other drivers.

it was not even a direct result of the juvenile's inexperience or willingness to engage in unlawful driving. According to the juvenile driver's uncontradicted testimony, he did not remain in the oncoming lane of traffic on purpose, but did so only because his passenger grabbed his arm.

In sum, given the foregoing considerations, the continuation of the chase onto Suitland Parkway, in light of what the MPD officers knew of the situation, may have constituted negligence, an issue we expressly do not decide. However, we do not think that a reasonable juror could find that, in the circumstances, the relevant conduct resulting in the collision amounted to such an extreme deviation from the reasonable standard of care as to constitute gross negligence on the part of the MPD officers.

### D.

Our conclusion that the officers in this case were not grossly negligent is consistent with case law from other jurisdictions dealing with this issue. *See* Joel E. Smith, Annotation, *Liability of Governmental Unit or Its Officers for Injury to Innocent Occupant of Moving Vehicle, or for Damage to Such Vehicle, as Result of Police Chase,* 4 A.L.R.4th 865 (1981 & 1995 Supp.). In those jurisdictions that apply a gross negligence or similar standard, it appears that virtually all appellate opinions addressing vehicular police pursuits of suspected law violators that ended in collisions between the pursued vehicles and vehicles of third parties hold as a matter of law that the police conduct at issue did not constitute gross negligence or its equivalent.

For example, in *Boyer, supra* note 8, the plaintiffs, who were injured in a collision with a car being pursued by a state trooper, alleged that the trooper pursued a suspected drunk driver at speeds over 100 miles per hour through heavy traffic and numerous intersections, without immediately activating his car's emergency equipment. The Maryland Court of Appeals held that those allega-

tions were insufficient to charge gross negligence.[17] 594 A.2d at 123–24, 131–32; *see also Peak, supra,* 408 S.E.2d at 308–10 (no gross negligence in trooper's pursuit of burglary suspect, who was known to have previously crossed a median into oncoming lanes of traffic, at speeds up to 100 miles per hour through a mixed commercial/residential area for less than five minutes, ending in collision when suspect again crossed into oncoming lane of traffic, where trooper was confronted with "serious law violator," weather conditions were good, trooper was familiar with road, there were no pedestrians, and traffic was moderate); *Fowler v. North Carolina Dep't of Crime Control & Public Safety,* 92 N.C.App. 733, 376 S.E.2d 11 (no gross negligence in trooper's pursuit of vehicle for speeding, over eight miles of a rural two-lane highway at speeds of 115 miles per hour, without activating his car's emergency equipment, where pursuit occurred in sparsely populated area with almost no traffic; court further affirmed trial court's finding that trooper was not even negligent), *review denied,* 324 N.C. 577, 381 S.E.2d 773 (1989); *Bullins v. Schmidt,* 322 N.C. 580, 369 S.E.2d 601 (1988) (no gross negligence in eighteen-mile police pursuit of suspected drunk driver at speeds up to 100 miles per hour, where traffic was light, road was dry, and police used their emergency lights and sirens and did not collide with anything themselves); *Breck, supra* note 11, 141 Ill.App.3d 351, 95 Ill.Dec. 615, 490 N.E.2d 88 (no willful and wanton negligence in police pursuit of reckless driver at speeds up to fifteen miles per hour above speed limit on curved, wet roads, where traffic was light and there were no businesses or residences in the area of the collision); *Saarinen v. Kerr,* 84 N.Y.2d 494, 620 N.Y.S.2d 297, 644 N.E.2d 988 (1994) (no recklessness in police pursuit of reckless driver for one or two minutes on wet roads at sixty miles per hour in commercial area with speed limit of thirty-five miles per hour, where roads where "relatively empty"); *see also Banks, supra* note 13, 646 A.2d at 983

---

17. The intoxicated state of the driver in *Boyer* (connoting dangerous driving), like the young age of the driver in this case (connoting inexperienced driving), can be seen as a double-edged sword. On the one hand, such factors may in-crease the hazards of the pursuit. On the other hand, however, such factors may make the driver more dangerous regardless of the pursuit, and thus may make the need to apprehend the driver more compelling. *See Boyer,* 594 A.2d at 137.

(Farrell, J., concurring) (arguing that there was no gross negligence in police pursuit of stolen car at fifty to eighty miles per hour for about one mile, passing an elementary school and running red lights).

Indeed, of those jurisdictions that apply a gross negligence or similar standard, we are aware of only one appellate opinion permitting the factfinder to find liability in a similar context. *See Kuzmics v. Santiago*, 256 Pa.Super. 35, 389 A.2d 587 (1978).[18] In *Kuzmics*, Pennsylvania's intermediate appellate court held that it was error for the trial court to conclude, as a matter of law, that police who pursued a vehicle at high speeds, traveling through red lights and in the oncoming lane of traffic, through an area that the police knew was "highly congested" with pedestrian and vehicular traffic, did not act in "reckless disregard for the safety of others." *Id.* 389 A.2d at 588–91. The pursued vehicle in *Kuzmics* collided with a vehicle leaving a factory during a shift change. The police were aware of the shift change at the factory, and of the existence of additional pedestrian and vehicular traffic in the area during shift changes. *Id.* at 591. Thus, there was evidence that the police in *Kuzmics* acted with knowledge of an obvious risk that was so great as to make harm highly probable. In contrast, such evidence was missing in this case, which involved a parkway with light traffic, limited access, and no pedestrians.

In sum, in view of the foregoing, we conclude that, as a matter of law, the MPD officers' relevant conduct in pursuing the Toyota in this case did not amount to gross negligence under § 1–1212.[19]

## III.

We turn now to the District's argument that, since it cannot be held directly liable for the collision based on the conduct of the MPD officers involved in the pursuit unless that conduct was grossly negligent, liability cannot be indirectly imposed based on the officers' training.

### A.

■ It does not appear that the District made this precise argument to the trial court.[20] However, the District is clearly correct in arguing—both at trial and on appeal—that it was error to instruct the jury on an ordinary negligence standard. In *District of Columbia v. Banks*, 646 A.2d 972 (D.C.1994), we held that the District could not be held liable for an injury arising out of a police pursuit based on the ordinary negligence of the police officer who supervised the pursuit. We said that the proper standard was gross negligence because § 1–1212

> plainly requires a showing of gross negligence by *someone* acting for the District. To treat a supervisor's ordinary negligence as sufficient would "cut the concept too fine and could significantly cripple the limitation expressly incorporated in the District's waiver of governmental immunity

---

18. For trial court opinions permitting a finding of liability, see *Hawkins v. District of Columbia*, 124 Daily Wash. L. Rptr. 1125 (D.C.Super.Ct. Jan. 16, 1996); *Joyner v. District of Columbia*, 109 Daily Wash. L. Rptr. 357 (D.C.Super.Ct. Feb. 2, 1981). We cited *Joyner* in *Banks, supra* note 13, noting that "reasonable people might differ" on whether *Joyner* was wrongly decided, but we did not decide the issue ourselves. 646 A.2d at 978.

19. In so holding, we simply recognize that the legislature has made a policy decision not to hold the District liable in such situations unless gross negligence is demonstrated, and that gross negligence is a very difficult standard to prove. The problem of high-speed police chases and the difficulties of weighing the conflicting factors involved has been widely noted. *See, e.g., Boyer, supra* note 8, 594 A.2d at 136–37; *DeWald v. State*, 719 P.2d 643, 649 (Wyo.1986); *Stanton v. State*, 26 N.Y.2d 990, 311 N.Y.S.2d 28, 28–30, 259 N.E.2d 494, 495 (1970); *Mixon v. City of Warner Robins*, 264 Ga. 385, 444 S.E.2d 761, 766–67 (1994) (Fletcher, J., concurring).

20. The District did take issue with the training claim at various points in the Walker trial, arguing, *inter alia,* that the District could not be held liable for ordinary negligence. The District argued in its motion for JNOV, as it does to us, that Mr. Walker did not make a sufficient showing either to establish a national standard of care for training or to prove proximate cause. In addition, the District argued in its JNOV motion and on appeal that the training claim should not have been submitted to the jury because the District did not disclaim vicarious responsibility for the officers' conduct. Appellees assert that this issue, raised for the first time in the JNOV motion, came too late. We need not address these arguments.

provided for in D.C.Code Sec. 1–1212 (1987)."

646 A.2d at 977 (emphasis original; quoting *Abney, supra,* 580 A.2d at 1041).

In this respect, we discern no relevant distinction between the negligent training claim in this case and the negligent supervision claim in *Banks.* Neither can be properly based on an ordinary negligence standard. We cannot accept appellees' argument that, unlike the claim based directly on the pursuit, the training claim does not "aris[e] out of the operation of an emergency vehicle on an emergency run" within the meaning of § 1–1212. It was not the MPD's mere acts or omissions with regard to training that gave rise to the negligent training claim in the Walker and Tobey cases. Instead, the claim arose out of the collision that killed Mrs. Walker, and was based on the theory that the collision was caused by the defective operation of emergency vehicles by Officers Wingate and Butts, which in turn was caused by the MPD's asserted defective training of those officers.

Accordingly, the District would clearly be entitled to a new trial on the training claim. At such a new trial, the District would be free to make the argument it now makes on appeal. *See Murphy v. Bonanno,* 663 A.2d 505, 508 n. 5 (D.C.1995) (in a new trial granted on other grounds, appellant would be free to pursue a line of inquiry on cross-examination supported by settled authority cited on appeal, even though the trial court barred the inquiry at the first trial and, by not then objecting, appellant waived any right to a new trial on that ground). Therefore, we reach the District's argument in the interest of judicial economy; because we agree with

the District, our disposition makes a new trial (and potential second appeal) unnecessary. *Cf. In re K.A.,* 484 A.2d 992, 997 (D.C.1984) (electing to review a question of law raised for the first time on appeal).

### B.

■ Under *Banks,* it is theoretically possible that the District might be held liable for an injury resulting from a police pursuit based on the gross negligence of an officer who supervised the pursuit, even if the officer who actually operated the emergency vehicle involved in the pursuit was not grossly negligent. 646 A.2d at 976–77.[21] However, in this respect, the supervision claim in *Banks* and the training claim in this case are distinct. The supervisor in *Banks* was involved in the very pursuit at issue in that case. He listened to the pursuing officer's simultaneous radio account of the pursuit and had the authority to order termination of the pursuit, but allowed it to continue. *Id.* at 975.

In contrast, in this case, while the claim underlying the negligent training assertion "aris[es] out of the operation of an emergency vehicle on an emergency run" within the meaning of § 1–1212, the District's agents and employees responsible for training the officers were not in any way involved in the pursuit at issue. An interpretation of § 1–1212 that would hold the District liable for grossly negligent training of officers with regard to pursuit procedures, even though the officers involved in the pursuit at issue were merely negligent or not even negligent at all, would in effect impose liability for "operation of an emergency vehicle" that was not itself grossly negligent.[22] Reading the

---

**21.** As discussed above, we held in *Banks* that the trial court erred by instructing the jury that the District could be held liable for ordinary negligence in the supervision of the pursuit. We concluded that gross negligence was the proper standard for the supervision claim. However, because the District failed to object to the jury instruction on the supervision claim, we affirmed the judgment for the plaintiff on the basis of the jury's finding that the supervisor was merely negligent, and we *did* not reach the issue of whether the pursuing police officer was grossly negligent. 646 A.2d at 976; *but see id.* at 983 (Farrell, J., concurring) (arguing that the pursuing officer was not grossly negligent). While a

scenario may exist in which the pursuing officer is not grossly negligent in conducting the pursuit, and yet the supervising officer is grossly negligent in supervising the pursuit, such a scenario is difficult to imagine.

**22.** Moreover, where injury results from an officer's operation of an emergency vehicle, but the officer's conduct is not grossly negligent, it is difficult to discern the requisite causal connection between the injury and any gross negligence in the officer's training. *See generally Twyman, supra* note 9, 655 A.2d at 852. Indeed, in the context of an ordinary negligence standard, an-

waiver of immunity in § 1–1212 narrowly, *see Abney, supra,* 580 A.2d at 1041, we cannot interpret the statute in such a way.

Accordingly, the judgment against the District in favor of William Walker is reversed. The judgment against the District in favor of Patricia Tobey is vacated and the case remanded. See note 3, *supra.*

*So ordered.*

WAGNER, Chief Judge, dissenting:

I am not persuaded that, viewed in the light most favorable to Walker, the evidence favors the District so overwhelmingly that the jury could not find reasonably that the gross negligence of its police officers was a proximate cause of the accident which resulted in Mrs. Walker's death.[1] *See Kuzmics v. Santiago,* 256 Pa.Super. 35, 389 A.2d 587, 589–91 (1978). There was evidence that the police engaged in an automobile chase of a juvenile, suspected of driving a stolen vehicle, for five miles, in the middle of a Saturday afternoon, in the District and onto Suitland Parkway in Maryland, at speeds of up to 90 miles per hour. The evidence also showed that the juvenile, who committed no traffic infractions before the pursuit commenced, evaded the officers' efforts to block him in the District and that the officers observed the suspect, who appeared to be too young to drive, losing control of the car as the officers continued the chase onto the Suitland Parkway just prior to the fatal collision with the passing motorist, Mrs. Walker. One police officer admitted at trial that police pursuit should be terminated when a suspect drives so erratically. D.C. Municipal Regulations provide that police officers may exceed the speed limit when pursuing suspected law violaters only "so long as it does not endanger life or property." 18 DCMR § 2002.3. Walker presented the testimony of two ex-perts who testified to the standard of care for the initiation, conduct and termination of police pursuits. They testified that the standard of care required a weighing of the urgency of an immediate apprehension of the suspect against the foreseeable risk of death or injury to the people involved or the public. The experts also faulted the police officers for pushing the chase under the circumstances, given the time, location and traffic conditions, youthfulness of the suspect, his manner of driving, as well as the officers' deviation from the requirements of the general orders of the police department. One expert testified that there were safer ways to stop a fleeing motorist under the circumstances. On these facts, a juror could conclude that the police officers' conduct deviated so grossly from the standard of care as to support a finding of a failure to exercise slight care or a conscious indifference for the rights and safety of others.[2] *See Boyer v. State,* 323 Md. 558, 594 A.2d 121, 132 (1991).

In determining whether the conduct which caused the accident amounts to gross negligence, courts which have reviewed the issue in the context of a high speed chase, consider a number of factors, among which are "the length, characteristics, and speed of the pursuit; the area of the pursuit; whether rural or urban; the highway characteristics such as curves of no passing zones; the presence of pedestrians and traffic; weather and visibility; and the seriousness of the law violation." *Peak v. Ratliff,* 185 W.Va. 548, 408 S.E.2d 300, 308 (1991) (citations omitted); *see also Boyer, supra,* 594 A.2d at 137. Such fact-based considerations necessarily result in each case turning on its own peculiar circumstances. Generally, whether conduct constitutes gross negligence is a question of fact for the jury. *See District of Columbia v. Banks,* 646 A.2d 972, 983 (1994). In the case

---

other jurisdiction has held that, where police officers were not negligent in their conduct of a pursuit that ended in a collision, any negligence on the part of the state in training the officers could not have been a cause of the collision. *DeWald, supra* note 19, 719 P.2d at 652.

1. *See Vassiliades v. Garfinckel's, Brooks Bros.,* 492 A.2d 580, 586 (D.C.1985) (citations omitted) (A judgment notwithstanding the verdict is appropriate when ' " 'the facts, viewed most favor-ably to the nonmoving party, permit[s] but one reasonable conclusion as to the proper judgment.' ")

2. Both of Walker's experts expressed the opinion that D.C. police officers were grossly negligent in continuing the chase and that their gross negligence was a proximate cause of the accident and Mrs. Walker's death.

**52**

before the court, these factors, weighed in light of the evidence, favor sustaining the jury's verdict. The lengthy chase and continued pursuit of an obvious juvenile, for offenses at the lower end of the seriousness level, at extremely high rates of speed, in the middle of a Saturday afternoon, on a major thoroughfare, in a large metropolitan area, where there was vehicular traffic, during which the immature suspect demonstrated an unwillingness to stop and was observed losing control of the vehicle before the fatal accident, reasonably could be found to render the risk of continued pursuit unreasonable and a fatal collision entirely foreseeable. A jury could reasonably conclude that such conduct reflects an indifference to the safety of others which amounts to gross negligence. *See Boyer*, 594 A.2d at 132. For these reasons, I respectfully dissent from the opinion of the court.[3]

---

**3.** I agree with the majority that liability cannot be imposed for acts of gross negligence which did not proximately cause the fatal accident. *See Sanders v. Wright*, 642 A.2d 847, 850 (D.C.1994). However, the majority does not reach the question of proximate cause here; therefore, I need not address it. *See* Majority Op. note 10.