Patricia DUGGAN, et al., Appellants,

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 98–CV–199.

District of Columbia Court of Appeals.

Argued Oct. 14, 1999.

Decided Oct. 11, 2001.

William G. Kelly, Jr., Washington, DC, for appellants.

Donna M. Murasky, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief for appellee.

Before WAGNER, Chief Judge, and RUIZ, Associate Judge, and BELSON, Senior Judge.

WAGNER, Chief Judge:

Appellants, Ellen Duggan and Francis Duggan, individually and as parents and natural guardians of Patricia Duggan, a minor, sued appellee, the District of Columbia (District), for damages for personal injuries their daughter sustained when a youthful driver hit her car while being chased by a vehicle driven by a District of Columbia Metropolitan Police Department (MPD) officer. The case was tried by a jury which deadlocked. The trial court granted the District's renewed motion for judgment as a matter of law, concluding that no reasonable juror could find that the police officer was grossly negligent, the standard required for the imposition of liability upon the District under the circumstances.[1] Appellants argue that the trial court erred in granting the motion because: (1) the evidence established gross negligence; and (2) the evidence established that the officer was not on an emergency run, and therefore, an ordinary negligence standard applied. We reverse

and remand for a new trial and for further proceedings consistent with this opinion.

## I.

### Factual Background

The evidence at trial showed that on a wet afternoon in early November 1992, Metropolitan Police Officer Dwayne Partman noticed a youth in an Acura automobile which was double parked in front of Deal Junior High School. Allen Butler, Jr., who was then thirteen years old, was behind the wheel of the Acura. Deal Junior High is located in upper Northwest near the Tenleytown Metro station. There are six other schools within five blocks of Deal. Officer Partman noticed Butler again as he passed him near 40th and Chesapeake Streets heading towards Albemarle Street. Three teenaged passengers were in the car. The officer began to follow Butler.

At the next intersection, 40th and Brandywine Streets, Butler stopped at the stop sign, and the officer also stopped. Officer Partman noticed the car jerk when it pulled away from the stop sign. The officer then followed Butler to 40th and Albemarle Streets, where Butler stopped the car again. As Butler pulled off, the officer noticed the vehicle jerk again. Butler turned right on Albemarle where there was an "extreme jerk" of the car, accord-

---

1. The District orally moved for judgment as a matter of law at the close of appellants' case, which the trial court took under advisement. The District renewed the motion upon completion of its case, and the trial court also took that motion under advisement. The District filed a written motion for judgment as a matter of law, and appellees filed a Motion for Leave to Further Amend the Amended Complaint to Include the Theory of Simple Negligence. In support of this motion, appellants argued that its original complaint and pretrial statement identified simple negli-

gence as the theory of the case and that testimony at trial "opened the door" for a simple negligence theory. Appellants claimed that Officer Partman denied being on an emergency run. Appellants also asserted that in the Rule 26(b)(4) statement they indicated that the expert witness would testify that the police officer was negligent and grossly negligent and that the pre-trial statement included both theories. Having granted the District's motion for judgment as a matter of law, the trial court denied appellants' motion as moot.

ing to the officer. At some point as the cars approached Wisconsin Avenue, Officer Partman called in the license plate to have it checked. Officer Partman testified that Butler looked familiar to him and that he appeared to be too young to be driving a car. Officer Partman further testified that Butler appeared to be having trouble operating the car and he was concerned that Butler might cause an accident. However, the officer testified that Butler had committed no traffic violations that he was aware of up to that point.

When Butler turned onto Wisconsin Avenue, Officer Partman turned on his overhead lights to stop him. Instead of stopping, Butler sped away, heading north on Wisconsin Avenue. Officer Partman pursued, and both of the cars went through the red light at Brandywine Street. While pursuing Butler, Officer Partman activated the emergency overhead lights and/or the siren. Witnesses estimated that the speed of the cars reached 50 to 60 miles per hour, although Officer Partman testified that he had not exceeded the speed limit. Butler also testified that he was driving at a speed of 50 to 60 miles per hour. Butler testified that he was trying to get away from the officer because he had no license and he was still at the age where his mother would administer corporal punishment.

About this time, Patricia Duggan was stopped at a stop sign facing north on 41st Street at the intersection of Davenport Street. As Duggan attempted to make a left hand turn onto Davenport Street, Butler ran his car broadside into her car. Butler testified that he did not apply his brakes. Butler also testified that the officer was right behind him just before the accident. The force of the impact caused

Duggan's car to be thrown in the air and flipped, and it tore a stop sign out of the ground.[2] Butler's car eventually stopped after slamming into a tree. Officer Partman was able to stop his car without leaving skid marks and without colliding with the other cars. The entire incident, from the attempted stop to the collision, lasted no more than twelve seconds and spanned three or four blocks. Officer Partman testified that it had been raining that day, and the streets were wet with slippery leaves on them. Officer Partman knew that school children were being dismissed from the several schools in the area around the time of the incident and that there was a lot of vehicular traffic on Wisconsin Avenue.

Dr. George Kirkham was qualified as an expert in the field of criminology. Dr. Kirkham testified that the national standard of care was that

> in considering any pursuit, continuation of any pursuit or initiation of it, an officer is supposed to weigh the urgency of an immediate apprehension against the forseeablity, the obvious forseeability of risk or death or injury to members of the community.

Further, Dr. Kirkham testified that in balancing these considerations, the officer is to consider the following factors:

> the character of the area .... such things as the weather conditions: Dry is good, wet or rainy, foggy is bad. The known condition of the ... vehicle that's being chased and-and the condition of the driver, that is to say is the driver known to be intoxicated, mentally ill or, ... is the driver a juvenile....
>
> The speeds of the vehicle, the way the vehicle is being opera[ted], does a driver

---

**2.** Duggan sustained severe brain stem trauma and residual neurological damage. She was in a coma for many months.

have the vehicle under good control or is it being operated in [an] erratic, unstable kind of manner.

The violation of traffic control devices is very important element to consider.... [W]e also consider the nature of the offense....

Dr. Kirkham rendered an opinion that the proximate cause of the accident "was the reckless pursuit engaged by Officer Partman in violation of national standards and regulations of his own department."[3]

Approximately nine months before the accident, General Order 301.3 became effective. This order set forth the policy and procedures to be used "relative to the operation of department vehicles as authorized 'emergency vehicles,' the proper use of emergency warning devices, and the guidelines for initiating and conducting vehicular pursuit and fresh pursuit." METROPOLITAN POLICE DEP'T, WASHINGTON, D.C., GENERAL ORDER 301.3, OPERATION OF EMERGENCY VEHICLES, FRESH PURSUIT AND VEHICULAR PURSUIT (January 13, 1992). The order prohibits police officers from pursuing vehicles to effect traffic stops and requires them to exercise extreme caution in school areas and at intersections and other locations where there is a potential for danger to the public. See General Order 301.3, I.B. & I.D.2.a (3).[4] At trial, Officer Part-

---

**3.** In further explanation, Dr. Kirkham testified as follows:

[I]f you look at the conduct of Mr. Butler, ... we ask ourselves from the cause of effect standpoint, what was he doing before and then what intervening factor changes his behavior. He was operating just driving along not doing much of anything.

Then the police officer prematurely, without backup, without the kind of manpower to safely stop the vehicle, he injects himself and now what happens? Now the vehicle takes off, it blows a traffic signal and we're on our way to a major injury accident.

**4.** General Order 301.3 provides in relevant part:

I.A.1.: Emergency Vehicles—For the purpose of this order an emergency vehicle is defined as a department vehicle equipped with, and actually operating, the warning devices listed below:
a. Siren and roof mounted emergency beacon light(s), or
b. Siren and portable emergency beacon light (while the light is actually mounted on the roof of the vehicle).
I.A.2.: Vehicular Pursuit—For the purpose of this order a vehicular pursuit is defined as the pursuit of a vehicle by a department vehicle, with all warning devices activated, to effect the arrest or prevent the escape of a fleeing law violator. In cases of self-initiated vehicle pursuits, members shall comply with the provisions of Part ID of this order.
* * * *

I.B.1.: Members must keep in mind that although it is important to respond swiftly to emergencies, it is equally important to reach the destination safely. To this end, extreme caution must be exercised in the area of schools, at intersections, and other such locations where a potential danger may arise to the public or to any member of the force.
* * * *
I.D.1.: Vehicular Pursuit Policy.
a. A member shall not become engaged in a vehicular pursuit except to effect the arrest or to prevent the escape, when every other means of effecting the arrest or preventing the escape has been exhausted, of a person who has committed a felony or has attempted to commit a felony in the member's presence, or when a felony has been committed and the member has reasonable grounds to believe the person he/she is attempting to apprehend committed the felony....
* * * *
I.D.2.a.: Authorized Pursuit Vehicles
(3) Members are prohibited from pursuing vehicles for the purpose of effecting a traffic stop.
* * * *
I.D.4.a.: Pursuit Procedures.
(1) Authority to control and coordinate the pursuit shall be vested in the watch commander, Communications Division.
(2) The monitoring field supervisor shall be strictly accountable for determining whether conditions justify continuation of the

man testified that he was aware of the General Order which was in effect at the time of the accident.

## II.

### Gross Negligence

Appellants argue that the evidence was sufficient to establish the essential elements of gross negligence under prevailing law in the District of Columbia, thus making the case one for a jury. In support of this argument, they contend that (1) "there was a willful and wanton violation of orders designed to protect the public in exactly this type of situation" and (2) "every conceivable aggravating risk factor that Plaintiff's qualified expert testified should be considered in a potential pursuit was present." Appellants further contend that the factors relied on by the trial court as weighing against a finding of gross negligence "either are not supported by the trial record or are insufficient to support its ruling. In addition, it appears that the trial court isolated some factors and excluded others and failed to consider the totality of the evidence."

### A. *Applicable Legal Principles*

A judgment as a matter of law is appropriate only when "the facts, viewed most favorably to the nonmoving party, permit but one reasonable conclusion as to the proper judgment." *Vassiliades v. Garfinckel's*, 492 A.2d 580, 586 (D.C.1985) (citations and internal quotation marks omitted). On appeal, we apply the same standard as the trial court in determining whether a juror could reach a verdict in

favor of the non-moving party. *Id.* (citations omitted).

Pursuant to D.C.Code § 1–1212 (1992), the District has waived its governmental immunity for claims for personal injury or death resulting from the negligent or wrongful operation of a District vehicle by a District employee acting within the scope of employment. *District of Columbia v. Banks*, 646 A.2d 972, 977 (D.C.1994). However, "[t]he District of Columbia cannot be held liable for claims arising out of the operation of a police car on an emergency run unless the officer driving the car acted with gross negligence." *District of Columbia v. Henderson*, 710 A.2d 874, 876 (D.C.1998); *see also* D.C.Code § 1–1212. D.C.Code § 1–1211(4) (2000) defines "[e]mergency run," in pertinent part, as

the movement of a District-owned vehicle, by direction of the operator or of some other authorized person . . ., under circumstances which lead the operator . . . to believe that such vehicle should proceed expeditiously upon a particular mission . . . for the purpose of dealing with a supposed . . . emergency, an alleged violation of a statute or regulation, or other incident requiring emergency action. . . .

In the context of this statute, we have defined "gross negligence" to require "such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others." *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C.

---

pursuit. Conditions may include, but not be limited to:
(a) Facts and circumstances relating to the felony offense;
(b) Road conditions;
(c) Weather;
(d) Pedestrian traffic;

(e) Proximity of schools, hospitals, and other high activity locations to the actual and potential pursuit route.

\* \* \* \*

(4) Only vehicles specifically authorized by the Communications Division shall participate in a vehicular pursuit.

1997). It includes conduct so extreme as to connote "some sort of bad faith." *Id.* (citing *Andrews v. Wilkins,* 934 F.2d 1267, 1272 (D.C.Cir.1991)). When evidence of subjective bad faith is not present, "the extreme nature of the conduct may be shown by demonstrating that the actor acted in disregard of a risk 'so obvious that [the actor] must be taken to be aware of it and so great as to make it highly probable that harm would follow.'" *Id.* at 44–45 (quoting 3 S. SPEISER, *et al.,* THE AMERICAN LAW OF TORTS, § 10.2, at 361 (1986)). Among the factors which courts consider in determining whether the conduct of a person involved in a police chase amounts to gross negligence are: (1) the length of the chase; (2) the type of neighborhood; (3) the characteristics of the street or roadways; (4) the presence of vehicular or pedestrian traffic; (5) weather conditions and visibility; and (6) the seriousness of the offense for which the police are pursuing the offender. *Id.* at 45 (quoting *Peak v. Ratliff,* 185 W.Va. 548, 408 S.E.2d 300, 308 (1991) (additional citations omitted)).

■ When reviewing a challenge regarding the sufficiency of evidence of claims alleging gross negligence,

> the appropriate inquiry is whether, given the balance of factors in this case, a reasonable juror could conclude that the conduct of the MPD officers so grossly deviated from the conduct required under the circumstances as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others.

*Henderson, supra,* 710 A.2d at 876 (citing *Walker, supra,* 689 A.2d at 46). As in any negligence case, "the plaintiff must establish 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Walker,* 689 A.2d at 45 (quoting *Toy v.*

*District of Columbia,* 549 A.2d 1, 6 (D.C. 1988) (internal quotation and citations omitted)). Therefore,

> a useful beginning point for analysis may be to examine the standard of care which must be breached in order even for simple negligence to be found. This standard of care can thus constitute a base point from which the magnitude of deviation can be assessed for purposes of the gross negligence inquiry.

*Id.* Generally, whether conduct constitutes gross negligence is a question of fact for a jury to determine. *See Banks, supra,* 646 A.2d at 983 (Farrell, J., concurring).

### B. *Analysis*

■ On the facts presented here, the evidence does not so overwhelmingly favor the District such that a jury could not reasonably find gross negligence on the part of Officer Partman which was a proximate cause of the accident which resulted in Duggan's injuries. There was evidence that Officer Partman engaged in an automobile chase of a juvenile for approximately three or four blocks at speeds up to 60 miles per hour, on streets which were slippery and wet from rain and leaves, in a partially residential and commercial area, during a time when young people from the seven schools in the area were being dismissed for the day. The evidence also showed that the juvenile, who committed no traffic infractions prior to the chase, evaded Officer Partman's efforts to perform a traffic stop. Officer Partman observed the youthful driver, who appeared to have no intention of stopping, go through at least two stop signs. While D.C. Municipal Regulations permit police officers to exceed the posted speed limit when pursuing suspect violators of the law, the officer may do so only "so long as it does not endanger life or property." 18 DCMR § 2002.2(c) (1995).

At trial, Duggan presented expert testimony from Dr. Kirkham regarding the national standard of care which required a weighing of the urgency of an immediate apprehension of the suspect against the foreseeable risk of death or injury to the people involved or the public. Dr. Kirkham expressed the opinion that Officer Partman's actions contributed in proximately causing the accident which led to Duggan's injuries.

■■■ While General Order 301.3 "essentially serves the purpose of an internal operating manual," a violation of this order is a factor the jury can consider in determining whether the officer was grossly negligent in departing from the standard of care.[5] *Walker, supra,* 689 A.2d at 47 n. 13. Here, the evidence was such that the General Order, with which Officer Partman was familiar, prohibited pursuits to effect a traffic stop. All of these factors, which weighed against the chase, a jury could reasonably find constituted an extreme departure from the national standard.

A review of the record convinces us, that viewed in the light most favorable to appellants, a rational juror could reasonably have found the police officer grossly negligent in conducting the chase. As appellants point out in summary, there was evidence that: (1) the area was "extremely hazardous, with numerous congested streets in a busy commercial and residential area," with seven schools in the vicinity and a busy Tenleytown Metro station "on which students could be expected to be converging from the many surrounding schools"; (2) it was a busy time of day with school letting out, seven teenagers were present at the intersection where the collision occurred, including Patricia Duggan, as well as five teenagers who were eyewitnesses and testified at trial; (3) the roads were wet and slippery with wet leaves; (4) the circumstances were not such that Butler had to be apprehended at the point when the officer initiated the chase; (5) the driver "exhibited signs that he was a young, inexperienced driver or was having problems in controlling the vehicle"; (6) the driver was a youth "which was a recognized hazard factor because youthful drivers are known to often drive recklessly when pursued"; (7) Officer Partman "pursued at extremely close quarters—a car length or less for most of the time—giving [the youth] no opportunity to stop and flee and pressing him to drive fast and recklessly"; and (8) the vehicles were traveling at least 30 miles per hour over the 25 miles per hour posted speed limit. We conclude, therefore, that the trial court erred in granting judgment for the District as a matter of law.

### III.

#### *Ordinary Negligence*

Appellants argue that the trial court "was mistaken both with regard to the law and the evidence in ruling that gross negligence was the only applicable standard and that he should direct a verdict for the District. . . ." They contend that the determination as to whether a police vehicle is on an "emergency run" as required by statute to invoke the gross negligence standard "is in the first instance a factual issue, and the relevant facts were never addressed by the trial court." Furthermore, appellants contend that the District itself recognized that whether the police

---

**5.** While evidence of violation of the General Order is a factor that the jury can consider in determining liability, the Order "cannot expand the District's liability beyond that authorized in the statute," *i.e.,* D.C.Code § 1212. *Walker, supra,* 689 A.2d at 47 n. 13; *Abney v. District of Columbia,* 580 A.2d at 1036, 1041 (D.C.1990).

officer was on an emergency run as defined by the statute was a factual issue for the jury to decide in that its proffered special jury instructions requested a finding that the officer was on an emergency run.

In addition, appellant argues that the evidence was sufficient to raise a question to the jury as to whether Officer Partman was actually on an emergency run in that (1) "[t]he circumstances at the time the officer initiated and engaged in the pursuit were not such as to support a belief that he should drive expeditiously to respond to a situation requiring such action"; (2) General Order 301.3 specifically directed police officers not to engage in pursuits to effect a traffic stop; (3) because the General Order was not inconsistent with District of Columbia law, "it plainly was designed to address the types of situations covered by D.C.Code [§§ ] 1–1212 and 1–1211(4)"; and, (4) Officer Partman himself testified that he was not on an emergency run. Therefore, the evidence was at least sufficient to show that Officer Partman was negligent if the jury found that he was not on an emergency run.[6]

### A. *Applicable Legal Principles*

As previously discussed, the District has waived its immunity for the negligent operation of government vehicles driven by District employees who are operating the vehicle within the scope of employment. *See* D.C.Code § 1–1212. However, claims arising from the operation of an emergency vehicle on an emergency run cannot be established except upon proof of gross negligence on the part of the operator.

*See id.* D.C.Code § 1–1211(4) defines "emergency run" to mean

> the movement of a District-owned vehicle, by direction of the operator or of some other authorized person or agency, under circumstances which lead the operator or such persons or agency to believe that such vehicle should proceed expeditiously upon a particular mission or to a designated location for the purpose of dealing with a supposed fire or other emergency, an alleged violation of a statute or regulation, or other incident requiring emergency action, or the prompt transportation to a place of treatment or greater safety of an alleged sick or injured person.

### B. *Analysis*

■ Appellants argue that whether a police vehicle is on an emergency run is a factual question for the jury. They contend that the Code's definition of emergency run is stated in terms which raise factual issues such as the purpose of the run and whether the circumstances warranted a reasonable belief that the vehicle should proceed expeditiously. *See* D.C.Code § 1–1211(4). Appellants assert that "the fact that a pursuit took place does not automatically establish that a police vehicle was on an 'emergency run' " and that in the most recent cases dealing with this issue, it was either undisputed that the police were on emergency runs within the meaning of the statute, or the issue was a factual one for the jury.

■ We have recognized that whether a vehicle was on an emergency run could be a disputed factual issue, and therefore,

---

6. In its Memorandum Order, the trial court stated as follows with regard to this issue: The gross negligence standard is the applicable standard for police chases. *See* D.C.Code § 1–1211 and § 1–1212. While the officer testified that he was not chasing

the youth that testimony does not change the standard to one of negligence because under the officer's version of the events the District could not have been found either negligent or grossly negligent.

subject to resolution by a jury. *See, e.g., Walker, supra,* 689 A.2d at 40; *Banks,* 646 A.2d at 972; *Abney, supra* note 5, 580 A.2d at 1036. In *Walker,* for example, the court suggested as much when it noted that the application of the gross negligence provision in D.C.Code § 1–1212 was not in dispute because "[i]t is undisputed that the MPD vehicles were emergency vehicles on emergency runs." 689 A.2d at 44 n. 6. Similarly, in *Banks,* the court observed that it was undisputed that the police officer was operating an emergency vehicle and on an emergency run, and therefore, the gross negligence standard applied. 646 A.2d at 976. In *Abney,* the question of whether the police vehicle was an emergency vehicle on an emergency run was submitted to the jury in a special interrogatory with appropriate instructions. 580 A.2d at 1039–40. The court noted that consideration of how to instruct the jury on the issue "was necessary in light of controlling sections of the District of Columbia Code," D.C.Code § 1–1212. *Id.* at 1039. Therefore, we agree that what constitutes an emergency run may depend on factual disputes which must be resolved by a jury. *See id.* at 1039–40.

Here, Officer Partman himself testified that he was not on an emergency run and that he was not pursuing the juvenile. This factual issue is also necessarily one for the jury in this case in light of General Order 301.3 which prohibits pursuits to effect a traffic stop. Assuming that a jury found that the officer was not on an emergency run, then the proper standard is ordinary negligence. *See* D.C.Code § 1–1212. The trial court did not address whether the officer was on an emergency run. In deciding that the District was entitled to judgment as a matter of law, the court simply applied the gross negligence standard and found that it had not been met. *See* R. at 207 n. 1. Appellants are entitled to have that issue resolved by a jury, unless the undisputed facts show that the officer was on an emergency run. In this case, the undisputed facts do not show that the officer was on an emergency run.

The District argues that even assuming that the officer's conduct must be evaluated under an ordinary negligence standard, the officer was not negligent as a matter of law. It contends that a police officer, in the performance of his duties, may engage in conduct that would be deemed negligent by ordinary motorists. For example, it points out that the police may run a red light and exceed the speed limit and such conduct would not be considered negligent. However, under an ordinary negligence standard, the police officer would be required to exercise reasonable care under the circumstances in exercising these prerogatives. *See Henderson, supra,* 710 A.2d at 876–77. In determining whether the officer was negligent under the ordinary negligence standard, consideration would still be given to the officer's speed, the distance at which he followed Butler, the prevailing wet roadway conditions, and presence of traffic. *See id.* It is not clear that the circumstances so favor the District that it is entitled to judgment as a matter of law, as the District contends.

For the foregoing reasons, we reverse and remand for a new trial and for further proceedings consistent with this opinion.

*Reversed and remanded.*